2010 ME 73

**STATE of Maine**

v.

**Thomas H. MITCHELL Jr.**

Supreme Judicial Court of Maine.

Argued: May 19, 2010.
Decided: Aug. 5, 2010.

James W. Strong, Esq. (orally), Greg N. Dorr, Esq., Thomaston, ME, for Thomas H. Mitchell Jr.

Janet T. Mills, Attorney General, William R. Stokes, Dep. Atty. Gen. (orally), Donald W. Macomber, Asst. Atty. Gen., Office of the Attorney General, Augusta, ME, for the State of Maine.

Panel: ALEXANDER,* LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: ALEXANDER, LEVY, MEAD, and GORMAN, JJ.

Dissent: SILVER, J.

LEVY, J.

[¶ 1] Thomas H. Mitchell Jr. appeals from a judgment of conviction entered in the Superior Court (Kennebec County, *Jabar, J.*) upon a jury verdict finding him guilty of the 1983 murder of a woman in her Fayette home. Having considered the issues raised by Mitchell, we address two in this opinion: (1) whether the court erred or abused its discretion in excluding evidence of an alternative suspect, and (2) whether the admission of evidence arising from an autopsy of the victim violated Mitchell's confrontation rights because the person who conducted the autopsy did not testify. We affirm the judgment.

## I. BACKGROUND

### A. Facts

[¶ 2] Viewing the evidence presented at trial in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt. *See State v. Manosh,* 2010 ME 31, ¶ 2, 991 A.2d 819, 820.

[¶ 3] Mitchell's father died in 1980, and, to Mitchell's chagrin, left his house in Fayette to Mitchell's stepmother. Judith Flagg and her husband subsequently purchased the home from Mitchell's stepmother.

[¶ 4] Soon thereafter, Mitchell arranged with the Flaggs to collect personal

---

* Although not available at oral argument, Justice Alexander participated in this opinion. *See* M.R.App. P. 12(a) (stating that a "quali-

fied justice may participate in a decision even though not present at oral argument").

items that had been left in the home. The first time Mitchell came to the house to get his belongings, nobody was home, and Mitchell left a note expressing his unhappiness that he had made a fruitless trip.

[¶ 5] After receiving Mitchell's note, Flagg's husband delivered the items to the realtor whom Mitchell's stepmother had employed. In 1981, Mitchell came to Flagg's home again, and when Flagg's husband answered the door, Flagg was standing behind him. When Flagg's husband told Mitchell that the items he sought were with the realtor, Mitchell's face appeared distorted and unhappy, and he left.

[¶ 6] On January 6, 1983, Flagg's husband left for work, and she remained in their home with their thirteen-month-old son. Also that morning, a South Portland police detective saw Mitchell, whom he knew, at approximately 7:00 a.m. driving a two-tone 1973 Ford Thunderbird in Portland headed north on Interstate 295. Portland is approximately 70 miles south of Fayette by car.

[¶ 7] At about 10:30 a.m., Flagg spoke with her sister on the phone. Flagg told her sister that a man had called earlier that morning asking for her husband. Flagg said that she had told the man that her husband was working and would not be home until 11:00 p.m. The man did not leave his name and said that he was an old friend of Flagg's husband who wanted to surprise him.

[¶ 8] Later during the phone conversation with her sister, Flagg put down the phone because somebody was at the door. When Flagg returned to the phone, she told her sister that her husband's friend was there and that she would call back, but she did not call back, and her sister got busy signals every time she tried to call Flagg that day.

[¶ 9] At about 10:45 a.m., Flagg called her brother. She said that a man who claimed to be a friend of her husband's was at the house complaining of car trouble. Because Flagg's brother was a mechanic, he offered to come over to help, but the man said he would stop somewhere in Fayette. Flagg's brother did not go to Flagg's house.

[¶ 10] At about noon, a mail carrier was on her route driving uphill toward Flagg's house. The road was slippery because it had been snowing that day. She saw an oncoming car crest the hill and swerve into a ditch and then back onto the road so that it almost struck her car, but the driver righted the car and traveled past her. She observed that the car had a maroon body and tan top. She also saw that the driver was a clean-shaven male in his early twenties with light brown hair and wearing a tan coat, grey wool scarf, and no glasses. The driver looked straight ahead without making eye contact with her.

[¶ 11] Between 2:00 and 3:00 p.m., Flagg's brother-in-law came to the house to install a new starter in a truck. Although Flagg's car was in the driveway, she did not come to the window when her brother-in-law drove in, and he assumed that she did not hear him arrive or was out with relatives. He installed the starter and left after being at the house for forty-five minutes to an hour.

[¶ 12] When Flagg's husband returned from work that night at about 11:00, he came in through the cellar door as usual and saw that all the lights were off except the light from the stereo. When he turned on the lights at the top of the cellar stairs, he saw Flagg lying dead on the floor with the telephone clutched in her hand and the baby lying alert on top of her chest. The baby had blood on his clothing. Flagg's husband picked up the baby, went down-

stairs, and called relatives, who came to the house. Somebody also called the police.

[¶ 13] There were footprints in the snow leading to the kitchen door and bloodstains on the floor in the baby's room. When the police arrived, they took photographs and made casts of the footprints in the snow. The police removed and bagged Flagg's clothing, and they bagged the child's clothing, which had been removed by a family member. The police placed bags over Flagg's hands and brought her body to the morgue. Ronald Roy, the Deputy Chief Medical Examiner at the time, performed the autopsy. He took a blood sample, clippings of Flagg's fingernails, and swabs of her mouth and other orifices. He put these items in separate containers, labeled them, and gave them to the director of the Maine State Police Crime Laboratory.

[¶ 14] The day after the murder, the mail carrier was again delivering mail on her regular route and saw that the police were at Flagg's home. She stopped to tell the officers what she had seen the day before. On January 9, the mail carrier worked with a detective to develop a composite picture of the driver she had seen in the two-tone car on January 6. The mail carrier was never able to positively identify a particular individual as the driver, however, and could not identify a specific car.

[¶ 15] In 1984, after Mitchell had become a suspect in the case, the police obtained a warrant to seize a pair of his shoes from his South Portland residence. The police also obtained a sample of Mitchell's blood and noted his possession of a car that was olive green with a tan roof and maroon primer paint on the driver's side. No arrest was made at that time.

[¶ 16] In 2005, the State Crime Lab's forensic chemist inventoried the various pieces of evidence and submitted them for appropriate testing in 2006. The lab's DNA specialist developed DNA profiles from the nails of Flagg's right hand. She found that the DNA profiles matched the profiles of Flagg and Mitchell at all thirteen targeted loci. The probability of a random match was one in 69.4 quadrillion. Testing at an outside lab could not exclude Mitchell as a source of DNA found in sperm detected in the swab of Flagg's mouth and on the baby's shirt.

[¶ 17] The crime lab's latent print examiner compared the footprint casts with Mitchell's shoes. She concluded that the right footprint in the snow was of the same size, had the same outsole design, and came from the same manufacturing mold as Mitchell's shoe.

B. Procedure

[¶ 18] On September 8, 2006, Mitchell was charged by indictment with the murder of Flagg. Before trial, it was represented that Roy, who had performed the autopsy, had retired to Canada and did not intend to come to Maine for the trial. Mitchell unsuccessfully moved to suppress all forensic evidence on the ground that its admission would violate his Sixth Amendment confrontation rights if the State failed to produce Roy as a witness subject to cross-examination.

[¶ 19] The State moved in limine for an order requiring Mitchell to present offers of proof regarding any alternative suspect evidence Mitchell wished to introduce. The court granted this motion, and Mitchell filed offers of proof that included the following facts regarding a male neighbor of the victim, who is the alternative suspect at issue on appeal:

- Like Mitchell, the neighbor wore a size-ten shoe.

- The neighbor lived down the street from Flagg.
- A woman who knew the neighbor was prepared to testify that he owned a pair of shoes similar to the shoes obtained from Mitchell's residence and that the sole design may have resembled the design of the soles on those shoes. She saw the neighbor wearing the shoes only once on a date near the date of the murder.
- The neighbor had a beige jacket with a wool collar and sometimes wore a scarf.
- A woman saw the neighbor in a suede, camel-colored coat that she never saw again after the murder.
- A woman had been beaten up by the neighbor in the past, and this woman thought he was very violent.
- The neighbor owned a two-tone green automobile.
- The neighbor met Flagg at a store where he once worked and said that she was "nothing but a slut."
- Flagg saw a man working on his car outside her window two days before the murder and told a guest who was visiting her that the man was a friend of her husband's who lived down the road.
- The neighbor's alibi—that he was at the unemployment office and at a restaurant—did not check out.
- The neighbor went to the restaurant after an employee was interviewed by the police and said, "you saw me here that day, didn't you?"
- After the murder, the neighbor was nervous and fidgety, and he frequently spoke about the murder.
- The neighbor was having trouble with his car around the time of the murder

and some damage to the front of the car was observed five days after the murder.[1]

- The neighbor's features were similar to those depicted in the composite drawing. The mail carrier also stated, when viewing a photograph of the neighbor, "number seven (7) seems to have an unusually mean look. I would like to see him in a lineup with a camel coat."
- The neighbor had a fight with a girlfriend, who was Flagg's best friend, and Flagg took her friend's side in the dispute.
- In her 2006 report, the latent print examiner was not able to rule out the neighbor as the source of certain fingerprints.

After considering Mitchell's proffer and hearing arguments on the matter, the court granted the State's motion to exclude the alternative suspect evidence.

[¶ 20] At trial, the current Chief Medical Examiner, Margaret Greenwald, testified that she had reviewed Roy's autopsy report and related materials. Greenwald stated that, in her opinion, the cause of Flagg's death was multiple stab wounds with hemorrhage. She also identified defensive wounds on Flagg's hands, her fingers, and her left wrist.

[¶ 21] Mitchell testified at trial and denied killing Flagg. He testified that he was with his aunt on the day of the murder. He also testified that he had injured himself and bled on the carpet in the Fayette house when his father owned it. Mitchell testified that he and his father had cleaned the bloodstain with bleach. Flagg's husband and the realtor who listed the house for sale testified that there was

1. The mail carrier who observed a car driven into a ditch the morning of January 6, 1983, did not testify to having observed whether the car was damaged in any way.

no stain or bleach mark on the carpet when the Flaggs purchased it. Mitchell's stepmother testified that she had no recollection of him injuring himself in the house when she owned it.

[¶ 22] The jury returned a guilty verdict, and the court sentenced Mitchell to life imprisonment. This appeal followed.

## II. DISCUSSION

### A. Exclusion of Alternative Suspect Evidence

[¶ 23] The court's decision to exclude alternative suspect evidence is reviewed for an abuse of discretion because it involves the weighing of probative value against considerations that militate against its admissibility. *State v. Robinson*, 628 A.2d 664, 666 (Me.1993); *cf.* M.R. Evid. 403. To the extent that constitutional interpretation is involved, we review that legal determination de novo. *See State v. Elliott*, 2010 ME 3, ¶ 17, 987 A.2d 513, 519.

[¶ 24] To determine whether Mitchell should have been permitted to present evidence suggesting that the neighbor, as an alternative suspect, committed the crime, we will (1) examine the standards governing the admissibility of alternative suspect evidence as established by our prior decisions; (2) consider the interplay between alternative suspect evidence and the accused's opportunity to present a complete defense; and (3) determine whether the court's exclusion of the alternative suspect evidence in this case was appropriate.

### 1. Maine Standards Regarding Alternative Suspect Evidence

[¶ 25] Courts will admit evidence regarding alternative suspects if (1) the offered proof is admissible at trial, and (2) the admissible evidence "is of sufficient probative value to raise a reasonable doubt as to the defendant's culpability" by estab-lishing a reasonable connection between the alternative suspect and the crime. *See State v. Bridges*, 2003 ME 103, ¶ 39, 829 A.2d 247, 258 (quotation marks omitted); *see also State v. Dechaine*, 572 A.2d 130, 134 (Me.1990). When determining whether a defendant's offered proof regarding an alternative suspect should be admitted, a court will consider only the evidence in the offer of proof that would be admissible in the proceeding. *See Bridges*, 2003 ME 103, ¶ 39, 829 A.2d at 258; *Dechaine*, 572 A.2d at 134; *State v. Williams*, 462 A.2d 491, 492 (Me.1983) (requiring that an offer of proof demonstrate the admissibility of the proposed testimony).

[¶ 26] A court must admit evidence that someone else may have committed the crime if that evidence has probative value sufficient to raise a reasonable doubt about the defendant's culpability. *Bridges*, 2003 ME 103, ¶ 39, 829 A.2d at 258. Evidence may raise a reasonable doubt about the defendant's culpability if it establishes a reasonable connection between the alternative suspect and the crime. *See id.; State v. Robinson*, 1999 ME 86, ¶ 20, 730 A.2d 684, 688–89.

[¶ 27] A defendant may establish a reasonable connection between the alternative suspect and the crime without *clearly linking* the alternative suspect to the crime, as is required in some other jurisdictions. *See Robinson*, 628 A.2d at 666–67; *see also* Stephen M. Everhart, *Putting a Burden of Production on the Defendant Before Admitting Evidence that Someone Else Committed the Crime Charged: Is It Constitutional?*, 76 Neb. L.Rev. 272, 277–85 (1997) (discussing and attempting to classify different jurisdictions' tests for admitting alternative suspect evidence, including tests requiring a direct connection between the alternative suspect and the crime). As we have stated, requiring a clear link between the alternative suspect

and the crime would place "too high a burden on a criminal defendant who is without the vast investigatory resources of the State." *Robinson*, 628 A.2d at 666–67.

[¶ 28] A defendant may not, however, without evidence of a connection between the alternative suspect and the crime, use the trial process to question witnesses in hopes of eliciting information that would "convert what amounts to speculation into a connection between the other person and the crime." *Robinson*, 1999 ME 86, ¶ 20, 730 A.2d at 688–89 (quotation marks omitted). We will uphold the exclusion of evidence if it is "too speculative or conjectural or too disconnected from the facts of a defendant's prosecution." *Dechaine*, 572 A.2d at 134 (quotation marks omitted).

[¶ 29] Our decisions, and United States Supreme Court jurisprudence, reflect that several types of evidence may be offered to demonstrate a reasonable connection between an alternative suspect and the crime with which a defendant has been charged. *See* David McCord, *"But Perry Mason Made it Look so Easy!: The Admissibility of Evidence Offered by a Criminal Defendant to Suggest that Someone Else is Guilty,"* 63 Tenn. L.Rev. 917, 938–47 (1996). Confessions and physical evidence connecting another person to the crime provide the most straightforward alternative suspect evidence. *See Chambers v. Mississippi*, 410 U.S. 284, 294–303, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *State v. Conlogue*, 474 A.2d 167, 172–73 (Me.1984); McCord, 63 Tenn. L.Rev. at 945–46, 950–51. Alternative suspect evidence may also be offered to establish mistaken identity, *see Dechaine*, 572 A.2d at 133 n. 6; *State v. Robbins*, 666 A.2d 85, 86 (Me.1995); McCord, 63 Tenn. L.Rev. at 944–45, or another person's motive or opportunity to commit the crime, *see State v. Waterman*, 2010 ME 45, ¶ 37, 995 A.2d 243, 251; *State v. Reese*, 2005 ME 87, ¶ 4, 877 A.2d 1090, 1092; *State v. Boobar*, 637 A.2d 1162, 1172 (Me.1994); *Robinson*, 628 A.2d at 666; *State v. Jones*, 580 A.2d 161, 162 (Me. 1990); *Dechaine*, 572 A.2d at 133 & n. 6; *State v. Harnish*, 560 A.2d 5, 9 (Me.1989); McCord, 63 Tenn. L.Rev. at 940–43. Evidence offered in support of a reasonable connection between the alternative suspect and the crime may also include evidence that the alternative suspect committed a similar crime involving the same signature features as the crime at issue to demonstrate "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," *Robbins*, 666 A.2d at 87 n. 3 (quotation marks omitted), *see* M.R. Evid. 404(b); *State v. Mills*, 2006 ME 134, ¶¶ 5, 15, 910 A.2d 1053, 1056, 1058; *Bridges*, 2003 ME 103, ¶¶ 38–42, 829 A.2d at 258–59; *Robbins*, 666 A.2d at 86–87 & n. 3; *Jones*, 580 A.2d at 162; *State v. Seger*, 532 A.2d 1013, 1016 (Me.1987); *Conlogue*, 474 A.2d at 172–73; *State v. LeClair*, 425 A.2d 182, 187 (Me.1981); McCord, 63 Tenn. L.Rev. at 943–44, or of suspicious behavior by the alternative suspect following the commission of the crime, *see Reese*, 2005 ME 87, ¶ 5, 877 A.2d at 1092; McCord, 63 Tenn. L.Rev. at 946–47.

[¶ 30] In short, whether to admit alternative suspect evidence of any variety depends on both the *admissibility* of the information contained in the offer of proof and the *probative value* of the proffered evidence in establishing a reasonable connection between the alternative suspect and the crime. *See Bridges*, 2003 ME 103, ¶ 39, 829 A.2d at 258; *Robinson*, 1999 ME 86, ¶ 20, 730 A.2d at 688–89; *see also* McCord, 63 Tenn. L.Rev. at 939–62 (discussing the comparative strength of different types of alternative suspect evidence). Although confessions or physical evidence may establish such a connection directly, *e.g., Chambers*, 410 U.S. at 294–303, 93

S.Ct. 1038; *Conlogue,* 474 A.2d at 172–73, other, indirect types of admissible evidence may also establish a reasonable connection between the alternative suspect and the crime, *see Robinson,* 628 A.2d at 666–67.

### 2. Meaningful Opportunity to Present a Complete Defense

 [¶ 31] "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the. Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina,* 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (quotation marks omitted). Mitchell asserts that at trial he was deprived of this opportunity when the court prevented him from calling the Flaggs' neighbor as a witness to question him as an alternative suspect.

[¶ 32] In *Holmes* the Court indicated that, to protect the accused's opportunity to present a complete defense, there may be instances where evidence must be admitted even if it would normally be excluded pursuant to the applicable evidence rules and common law formulations governing the admissibility of alternative suspect evidence. *See id.* at 324–26, 126 S.Ct. 1727. The application of court-created evidentiary rules will run afoul of this right if it "infringe[s] upon a weighty interest of the accused and [is] arbitrary or disproportionate to the purposes [the rules] are designed to serve." *Id.* at 324, 126 S.Ct. 1727 (alterations omitted) (quotation marks omitted). Thus, in *Holmes* the Court found unconstitutional a South Carolina rule that excluded alternative suspect evidence if the trial court concluded that the state had submitted strong evidence, including forensic evidence, of the defendant's guilt. *See id.* at 328–31, 126 S.Ct.

1727. The rule gave no consideration to the probative value of the defendant's alternative suspect evidence. *See id.* at 329, 126 S.Ct. 1727.

 [¶ 33] A meaningful opportunity to present a complete defense is not offended by the exclusion of "evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Id.* at 326–27, 126 S.Ct. 1727 (alterations omitted) (quotation marks omitted). Indeed, in *Holmes* the Court recognized that " 'well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury' do not normally breach defendants' constitutional rights," and that "one such 'well-established rule' [is] the rule that a court may exclude a defendant's evidence proffered to show that someone else committed the crime in question if that evidence is too speculative, remote, or immaterial." *United States v. DeCologero,* 530 F.3d 36, 73 (1st Cir.2008) (citing and quoting *Holmes,* 547 U.S. at 326, 327, 330, 126 S.Ct. 1727); *see Holmes,* 547 U.S. at 330, 126 S.Ct. 1727. Thus, the Constitution does not prevent a court from reasonably regulating the admission of alternative suspect evidence so long as it serves a legitimate purpose, such as the goal of focusing "the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *Holmes,* 547 U.S. at 330, 126 S.Ct. 1727.

[¶ 34] Having considered the law affecting the admissibility of alternative suspect evidence, we turn to consider the admissibility of the evidence offered in this case and the constitutionality of the court's evidentiary ruling.

### 3. Exclusion of the Alternative Suspect Evidence in this Case

[¶ 35] The Superior Court determined that Mitchell's offer of proof failed to establish a connection between the neighbor, Flagg, and the crime sufficient to raise a reasonable doubt about Mitchell's culpability. *See Bridges,* 2003 ME 103, ¶ 39, 829 A.2d at 258.

■ [¶ 36] The only physical evidence offered by Mitchell that could reasonably connect the neighbor to the crime scene was the evidence connecting a pair of shoes owned by the neighbor to the shoe print evidence that was preserved at the crime scene. A lay witness was prepared to testify that the neighbor's shoes were "similar to" the shoe model that Mitchell owned and that "the sole design of that model may resemble the one on [the neighbor's] shoe." The non-expert witness's opinion that the neighbor may have had the same shoes as Mitchell is admissible only if the opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." M.R. Evid. 701. Rule 701 was adopted for the purposes of (a) requiring firsthand knowledge or observation, and (b) limiting testimony regarding opinions or inferences to those that are helpful in resolving issues. M.R. Evid. 701 Advisers' Note. An opinion or inference by a witness is not helpful, and is therefore inadmissible, "if relating what [the witness] observed would put the jury in the position to come to its own conclusion." *Id.*

■ [¶ 37] Mitchell's offer of proof did not establish that the witness perceived that the sole pattern of the neighbor's shoes matched the sole pattern of Mitchell's shoes or the footprint casts. The determination of a pattern match requires more than just seeing a person wearing a pair of shoes similar to the shoes implicated in the crime. The lay opinion of the witness who saw the alternative suspect's shoes was therefore inadmissible pursuant to M.R. Evid. 701 because it was not rationally based on the perception of the witness.[2] In addition, because the exclusion of the lay witness's opinion that the sole pattern of Mitchell's shoes "may resemble" the pattern on the bottom of the neighbor's shoes serves the purposes of Rule 701 and is neither arbitrary nor disproportionate, there is no constitutional infirmity in its exclusion as alternative suspect evidence.[3] *See Holmes,* 547 U.S. at 324, 126 S.Ct. 1727.

---

2. In its entirety, Rule 701 provides:

**OPINION TESTIMONY BY LAY WITNESSES**

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

M.R. Evid. 701.

3. The exclusion of evidence regarding the neighbor is distinguishable from the unconstitutional exclusion of evidence based on hearsay rules in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). There, the jury was not allowed to hear evidence that a third party had admitted that he shot the police officer whom the defendant was accused of murdering. *Id.* at 292–93, 93 S.Ct. 1038. The Court held that a confession that would normally be excluded as hearsay was nonetheless admissible to guarantee the defendant a fair trial. *Id.* at 300–03, 93 S.Ct. 1038. The Court concluded that the confession was sufficiently reliable that "mechanistically" applying the hearsay rule, which was designed to ensure the reliability of evidence, would thwart the rule's purpose and would undermine justice. *Id.* By contrast, the exclusion of the speculative shoeprint evidence in

[¶ 38] Assuming for purposes of our analysis that all of the other proof that Mitchell offered was admissible, we conclude that the court acted within the bounds of its discretion by excluding the alternative suspect evidence. Mitchell offered proof that the neighbor had a two-tone car, that he resembled the composite picture that the police developed with the mail carrier, that he had been violent before, that he did not necessarily like Flagg, that his alibi was unsubstantiated, that his behavior was strange after the murder, and that he could not be ruled out as the source of two indistinct fingerprints. These facts provide only weak proof of motive or propensity, and only moderately probative evidence of opportunity, mistaken identity, or suspicious post-crime behavior. *Cf. Waterman*, 2010 ME 45, ¶¶ 21, 37, 995 A.2d at 249, 251–52 (affirming exclusion of evidence that another person had been involved in drug dealing with the victim and knew that another dealer had loaned money to the victim two days before the killing); *Boobar*, 637 A.2d at 1172 (affirming exclusion of evidence, offered in a murder case, that another individual believed he had been investigated by the Department of Human Services for alleged improper sexual contact with the victim); *Robinson*, 628 A.2d at 666–67 (affirming exclusion of evidence that an alternative suspect had been dating one of the murder victims shortly before her death, that this alternative suspect believed that the victim might be talking to the police about his dealing in stolen firearms, and that this suspect had the opportunity to kill her). Excluding the shoe evidence, *see* M.R. Evid. 701, Mitchell's remaining evidence regarding the neighbor as an alternative suspect, taken as a whole, did not rise above the level of speculation and did not establish a reasonable connection between

this case based on the Rules of Evidence does

the neighbor and the crime. Its exclusion was appropriate so as to "focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *Holmes*, 547 U.S. at 330, 126 S.Ct. 1727.

[¶ 39] Because Mitchell's alternative suspect evidence failed to raise a reasonable doubt concerning his culpability, the court did not abuse its discretion in excluding it, and Mitchell was not denied a meaningful opportunity to present a complete defense.

B. Right of Confrontation

[¶ 40] Mitchell contends that he was also denied the right to confront a witness against him because the State failed to produce as a witness the doctor who performed Flagg's autopsy.

[¶ 41] We review constitutional interpretations de novo. *See Elliott*, 2010 ME 3, ¶ 17, 987 A.2d at 519. "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const., amend. VI. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford v. Washington*, 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Federal courts interpreting *Crawford* soon after its publication held that autopsy reports could be admitted, even in the absence of cross-examination, as business records that were not *testimonial*. *See, e.g., United States v. Feliz*, 467 F.3d 227, 233–37 (2d Cir.2006).

[¶ 42] More recently, however, the United States Supreme Court held, by a vote of five to four, that some business records related to forensic analysis may be subject to the protections of the Confron-

not undermine the interests of justice.

tation Clause because they are "prepared specifically for use at . . . trial," *Melendez–Diaz v. Massachusetts*, 557 U.S. ——, ——, 129 S.Ct. 2527, 2540, 174 L.Ed.2d 314, 329 (2009), and are testimonial statements subject to confrontation pursuant to the Sixth Amendment, *id.* at ——, 129 S.Ct. at 2535–41, 174 L.Ed.2d at 325–30. Specifically, the Court held that, in a criminal prosecution, the government was required to produce as a witness the analyst who tested a substance to determine that it was cocaine, even if the defendant had the opportunity to call the witness independently, because the burden is on the government to establish its case through witness testimony, not ex parte affidavits. *Id.* at ——, ——, 129 S.Ct. at 2530–31, 2540, 174 L.Ed.2d at 320, 330.

[¶ 43] It is unclear whether the Court's holding in *Melendez–Diaz* should be applied so as to permit the State to offer an expert witness's testimony based on an autopsy report that the expert witness did not author. Justice Thomas stated in his concurring opinion that he "continue[s] to adhere to [his] position that the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *See id.* at ——, 129 S.Ct. at 2543, 174 L.Ed.2d at 333 (Thomas, J., concurring) (quotation marks omitted). The opinion suggests that the rationale of *Melendez–Diaz* should be limited to trial-oriented documents and should not extend to documents, such as autopsy reports, that are produced during the investigation.

[¶ 44] Since the Court issued the *Melendez–Diaz* opinion, courts have been divided over whether an expert who did not conduct an autopsy may offer opinion or fact testimony based on a review of the autopsy report and related evidence. The Supreme Judicial Court of Massachusetts held that a medical examiner could testify about his opinions, which were based on an autopsy report that he did not author, but that any testimony about findings or conclusions contained in the report would constitute testimonial hearsay and violate the Confrontation Clause. *Commonwealth v. Avila*, 454 Mass. 744, 912 N.E.2d 1014, 1027–30 (2009).

[¶ 45] The Court of Appeals of Washington took a slightly different approach, holding that an expert witness could testify about another examiner's autopsy report if the report formed a basis for the testifying expert's opinion. *State v. Lui*, 153 Wash.App. 304, 221 P.3d 948, 953–59 (2009), *review granted*, 168 Wash.2d 1018, 228 P.3d 17 (2010). The court distinguished *Melendez–Diaz* because in that case, no live witness was made available for cross-examination by the defense, whereas in *Lui*, witnesses were made available to provide expert opinions and be subjected to cross-examination. *Lui*, 221 P.3d at 955–56. The court held that the experts could refer to the factual bases for their opinions, relying on the report and other available evidence, without running afoul of the Confrontation Clause because experts may rely on inadmissible materials to form their opinions. *Id.* at 958–59.

[¶ 46] Other courts have held that autopsy reports themselves are testimonial and subject to the Confrontation Clause when examiners conducting autopsies as part of murder investigations understand that their findings and opinions will be used in any resulting criminal prosecution. *See Wood v. State*, 299 S.W.3d 200, 208–10 (Tex.Ct.App.2009), *review denied*, 2010 Tex.Crim.App. LEXIS 115 (Mar. 24, 2010); *see also State v. Locklear*, 363 N.C. 438, 681 S.E.2d 293, 304–05 (2009).

[¶ 47] The present case is distinguishable from those cases that exclud-

ed autopsy reports because here, the State did not offer the autopsy report itself in evidence. Rather, the State offered the testimony of Greenwald to establish the cause of death and identify defensive wounds. Because Mitchell was able to cross-examine Greenwald concerning her expert testimony, this case is also distinguishable from *Melendez–Diaz,* where no live witness was made available for cross-examination. *See Lui,* 221 P.3d at 955–56. Further, in light of Justice Thomas's concurrence in *Melendez–Diaz,* it appears unlikely that the majority of the Supreme Court intended to include autopsy information underlying expert testimony in the same category as evidence "prepared specifically for use at ... trial." *Melendez–Diaz,* 557 U.S. at ——, 129 S.Ct. at 2540, 174 L.Ed.2d at 329; *see also id.* at ——, 129 S.Ct. at ——, 174 L.Ed.2d at 333 (Thomas, J., concurring). For these reasons, the admission of Greenwald's testimony did not violate Mitchell's confrontation rights.[4]

The entry is:

Judgment affirmed.

SILVER, J., dissenting.

[¶ 48] I would vacate the conviction and grant a new trial allowing the jury to hear the alternative suspect evidence. Thomas H. Mitchell Jr. was charged with murdering Judith Flagg twenty-three years after the victim was found dead in her home. Mitchell had been a suspect along with others for this lengthy period. Most of the evidence was gathered and analyzed in the 1980s. Eventually, DNA evidence linked him to the murder and he was indicted for the crime. Because the investigation of alternative suspects was part of the long police investigation, alternative suspect evidence is important for Mitchell's defense.

[¶ 49] As the Court explains, a trial court must admit evidence of an alternative suspect if the evidence reasonably establishes a connection between the alternative suspect and the crime. *See State v. Bridges,* 2003 ME 103, ¶ 39, 829 A.2d 247, 258. This requirement is driven by the defendant's Constitutional right to present a complete defense. *See Holmes v. South Carolina,* 547 U.S. 319, 323, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). "The evidence incriminating another person must be competent and confined to substantive facts which create more than a mere suspicion that such other person committed the crime.... Without such evidence, a defendant cannot be allowed to use his trial to conduct an investigation...." *State v. Dechaine,* 572 A.2d 130, 134 (Me.1990) (quotation marks omitted).

[¶ 50] We do not, under this standard, require defendants to conclusively prove that the alternative suspect committed the

---

4. Regarding Mitchell's five other arguments, we conclude, contrary to his contentions, that (1) the court did not abuse its discretion in admitting the composite picture, *see* M.R. Evid. 403; *see also State v. Dwyer,* 2009 ME 127, ¶ 31, 985 A.2d 469, 478; (2) his Fourth Amendment rights were not violated when officers induced him to step on paper that would capture his shoe print, *see United States v. Knotts,* 460 U.S. 276, 280–85, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983); *State v. Harriman,* 467 A.2d 745, 748 (Me.1983); (3) the State's DNA evidence was properly admitted despite Mitchell's challenges to the chain of custody, *see State v. Lobozzo,* 1998 ME 228, ¶ 10, 719 A.2d 108, 110; *State v. Poirier,* 1997 ME 86, ¶ 4, 694 A.2d 448, 449; (4) the court did not abuse its discretion in admitting testimony from a police officer who saw Mitchell heading north from Portland on the morning of the murder, M.R. Evid. 401, 403; *Dwyer,* 2009 ME 127, ¶ 31, 985 A.2d at 478; and (5) the pre-indictment delay did not necessitate dismissal of the indictment; *see United States v. Lovasco,* 431 U.S. 783, 788–97, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *State v. Berkley,* 567 A.2d 915, 917 (Me.1989).

crime. *See State v. Robinson*, 628 A.2d 664, 666–67 (Me.1993) ("We have never required that alternative perpetrator evidence 'clearly link' the alternative perpetrator to the commission of the crime at issue" because such a requirement "placed too high a burden on a criminal defendant who is without the vast investigatory resources of the State"). Instead, we only require that defendants make enough of a showing to demonstrate more than just speculative fishing, and that it is therefore worth allowing the defendant the time to present that defense theory. *See Dechaine*, 572 A.2d at 134 n. 9 (expressing concern with possibility of confusion, delay, misleading the jury, and waste of time); *see also Holmes*, 547 U.S. at 329, 126 S.Ct. 1727 (finding deficient a state rule under which "the trial judge does not focus on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt").

[¶ 51] Here, Mitchell met the reasonable-connection standard. Mitchell proffered evidence including the description of a man seen driving suspiciously from the area and testimony that the neighbor fit the description and owned a similar car and clothing to the man; testimony that the shoe impressions taken from the scene were from a brand of shoe that the neighbor was known to own; evidence that the neighbor was violent; evidence that the neighbor dated a friend of the victim and that the victim had interfered in an argument between the neighbor and the woman; evidence that the neighbor had met the victim at a work party; evidence that the neighbor told police repeatedly that he was at a restaurant but none of the many employees who knew him well had seen him there; testimony that the neighbor acted oddly after the murder; and evidence that the neighbor had damage to his car consistent with damage that may have occurred to the car seen leaving the vicinity of the scene. The Court is correct that some of this evidence may be inadmissible at trial. Even excluding that evidence, however, the remaining evidence establishes far more than "a very weak logical connection to the central issues." *See Holmes*, 547 U.S. at 330, 126 S.Ct. 1727.

[¶ 52] The evidence in this case is much stronger than in cases where we have held that alternative suspect evidence was properly excluded. *See, e.g., State v. Waterman*, 2010 ME 45 ¶¶ 37, 39, 41, 995 A.2d 243, 251–52 (holding that alternative suspect evidence was properly excluded because there was no evidence suggesting motive or opportunity, only that the alternative suspects knew and interacted with the victim); *State v. Mills*, 2006 ME 134, ¶ 15, 910 A.2d 1053, 1058 (affirming the exclusion of evidence where the only evidence connecting the alternative suspect to the crime was her prior experience with knives); *Bridges*, 2003 ME 103, ¶ 42, 829 A.2d at 259 (affirming exclusion of inadmissible character evidence); *State v. Robinson*, 1999 ME 86, ¶ 19, 730 A.2d 684, 688 (holding that evidence was properly excluded where it did not indicate that the alternative suspect had access to the victim or the physical characteristics of the perpetrator). The evidence proffered by Mitchell established a link between the neighbor and the victim, a possible motive, opportunity, and suspicious behavior. The only item missing is DNA evidence. This met the reasonable connection threshold. It is for the jury to decide whether it is convinced by the evidence.

[¶ 53] The court has the power to limit the evidence to reduce the potential for confusion and delay. In *State v. Reese*, for example, we affirmed the judgment of the trial court that admitted limited evidence regarding an alternative suspect but excluded other related evidence by agreement of the parties. 2005 ME 87, ¶ 7, 877

A.2d 1090, 1092. The admission of alternative suspect evidence is not "all or nothing." Rather, the court may admit evidence that is sufficiently probative while excluding other evidence that is too attenuated or that presents too great a likelihood of misleading or confusing the jury.

[¶ 54] Because the evidence that Mitchell offered reasonably established a connection between the neighbor and the crime, he was entitled to present an alternative-suspect defense. Therefore I would vacate the judgment and remand for a new trial allowing the alternative-suspect evidence to be heard by the jury.