2014 ME 86

### STATE of Maine

v.

### Cleveland O. CRUTHIRDS.

### Docket No. And–13–421.

Supreme Judicial Court of Maine.

Argued: May 13, 2014.
Decided: June 26, 2014.

Lauren Wille, Esq. (orally), DeGrinney Law Offices, Portland, for appellant Cleveland Cruthirds.

Andrew P. Matulis, Asst. Dist. Atty. (orally), Androscoggin County DA's Office, Auburn, on the briefs and argued, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

MEAD, J.

[¶ 1] Cleveland O. Cruthirds appeals from a judgment of conviction entered by the trial court (*Clifford, J.*) following a jury verdict finding him guilty of elevated aggravated assault (Class A), 17–A M.R.S. § 208-B(1)(A) (2013); burglary (Class B), 17–A M.R.S. § 401(1)(B)(4) (2013); and violation of a condition of release (Class E),

15 M.R.S. § 1092(1)(A) (2013). Cruthirds contends that the court erred in (1) admitting in evidence a witness's videotaped interview with police as a recorded recollection pursuant to M.R. Evid. 803(5); (2) excluding evidence of an alternative suspect; (3) imposing an insufficient sanction on the State for a discovery violation; (4) declining to instruct the jury that it could infer that evidence destroyed by the State was favorable to Cruthirds; and (5) declining to allow Cruthirds to play a 911 tape during his initial cross-examination of a police detective. Cruthirds also contends that the State's destruction of potential DNA evidence in the form of some of the victim's bloody clothing, and its failure to preserve certain witness statements, violated his right to due process and deprived him of a fair trial. We affirm the judgment.

## I. BACKGROUND

[¶ 2] The record, viewed in the light most favorable to the jury's verdict, supports the following facts. *See State v. Diana*, 2014 ME 45, ¶ 2, 89 A.3d 132. The victim had an on-and-off dating and sexual relationship with Cruthirds beginning in August 2011. On November 23, 2011, after the victim asked Cruthirds to leave her apartment, he smashed her TV and assaulted her. Police were called and a bail condition was imposed barring Cruthirds from having any contact with the victim. On December 2, police officers performing a domestic violence check discovered Cruthirds with the victim at her apartment and arrested him for violating his bail conditions. He was incarcerated until December 7, when he returned to the apartment with a police officer to retrieve his belongings. Some time after that, Cruthirds and the victim again had contact.

[¶ 3] On December 10, after a night of drinking, the victim went to bed around 7:00 a.m. and got up again at around 5:00 p.m. She called her friend Karie Lessard and asked her to come over. Lessard arrived and the two women sat on the victim's bed smoking cigarettes. Cruthirds's ring and bracelet, which had not been returned to him with the rest of his property, were on the nightstand. The victim was engaged in a Facebook conversation with, and talking to Lessard about, "Deshawn," a man with whom she had had a relationship in the past and who was the father of her child. She also talked to Lessard about pawning the ring and bracelet.

[¶ 4] As the victim and Lessard talked, the bedroom door flew open to reveal Cruthirds standing in the doorway. He had a "[v]ery blank" affect and accused the victim of cheating on him. The victim testified that the next thing she remembered was Lessard screaming, "he has a knife," and Cruthirds stabbing her repeatedly in the head. The trauma surgeon who operated on the victim that night reported treating twenty-one stab wounds. The victim spent the next six days at Central Maine Medical Center. At the time of the trial she continued to suffer from complete deafness in her right ear, significant nerve damage to her face, and significant weakness in her right arm. When she returned to her apartment after being discharged from the hospital, Cruthirds's ring and bracelet were gone from her nightstand. During her trial testimony, the victim positively identified Cruthirds as her assailant.

[¶ 5] Although the victim did not remember making a call to 911, a tape of a 911 call was admitted in evidence and played for the jury; the victim identified the voices on the tape as hers and Cruthirds's. At the beginning of the call, the victim calmly told the dispatcher that Cruthirds was in her house, that he had a bail condition not to be there, and that she did

not know how he got in. She identified Cruthirds by name and spelled his last name. She addressed a man who can be heard in the background as "Cleveland." The man can be heard saying, "you just cheated on me," and "Deshawn, Deshawn, Deshawn, Deshawn, Deshawn." Just after the victim said, "You know you're going to jail, you're not supposed to have any contact with me," she told the dispatcher that "[h]e's grabbing a fucking knife right now," and then began to scream continuously.

[¶ 6] As she did at a pretrial hearing, Lessard testified at trial that she did not remember anything about the day the victim was attacked. Over Cruthirds's objection, the court, pursuant to M.R. Evid. 803(5),[1] admitted a videotape of Lessard's interview with Detective Lee Jones of the Lewiston Police Department that was conducted on the night of the attack. In that interview, Lessard told Jones that Cruthirds, whom she knew and identified by name, was apparently hiding in the victim's apartment before he kicked open the bedroom door and told the victim, "I knew you were cheating on me." Lessard said that when the victim grabbed her phone, Cruthirds went into the kitchen, found a black-handled knife, and returned to the bedroom with the knife in his pocket. Lessard told Jones that she saw Cruthirds raise the knife as if to stab the victim. The victim began screaming and Lessard ran to an upstairs neighbor's apartment on the third floor to summon help; she could

hear the victim still screaming from her first floor apartment.

[¶ 7] A neighbor on the third floor of the victim's building testified that at about 8:47 p.m. she heard screaming from a lower floor and a female voice saying, "He's killing me." Lessard appeared outside the neighbor's door yelling to be let in, and that "[the victim] was being killed." Lessard "was in a total panic and just screaming that [the victim's] ex-boyfriend was killing her and ... to call 9–1–1." The neighbor called police.

[¶ 8] The first officer arrived within one minute of receiving a bail violation complaint at 8:48 p.m. He heard screaming from an upper floor, saw a significant amount of blood, and located the badly bleeding victim on a fourth floor landing. She was "hysterical," and when the officer asked her who injured her, "[s]he had stated the name Cleveland Cruthirds." A sergeant who soon responded thought the victim would die of her injuries. When he asked her who had attacked her, "she said Cleveland and I said Cleveland who and she said Cleveland Cruthirds."

[¶ 9] Cruthirds was arrested on Horton Street in Lewiston just after midnight. In a videotaped interview with Detective Jones shortly thereafter, he acknowledged that the victim was his ex-girlfriend, but he denied being at her apartment that night. Jones testified that at one point he asked Cruthirds about several small cuts on his hand; Cruthirds initially denied having any cuts but then said they were caused by glass. When Jones left the

---

1. Maine Rule of Evidence 803(5) provides:
    The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
    . . . .
    (5) Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admissible, the memorandum or record may be read into evidence but shall not be received as an exhibit unless offered by an adverse party.

room, Cruthirds began licking his hand at the site of the cuts. Later, with Jones still out of the room, Cruthirds took a ring out of his pocket and wiped it on his pants, then put it on and began licking it.

[¶ 10] A forensic DNA analyst with the State Police crime laboratory testified that blood taken from grooves in the ring was a mixture that could have been contributed by the victim and Cruthirds; one in 317,-000 Caucasians was a potential contributor to the mixture, as was one in 42,600 African–Americans.[2] DNA extracted from blood found on Cruthirds's elbow and jeans matched the victim's DNA. The analyst also examined selected cuttings from the shirt the victim was wearing, and testified that at some sites she found prostate specific antigen (PSA) that did not come from Cruthirds, indicating that the victim's shirt at some unknown time had contact with two unidentified males. Although PSA is a component of semen, the analyst could not say that it came from semen in this case because no sperm cells were found; the PSA could have come from blood, saliva, skin, or some other source.

[¶ 11] Cruthirds was indicted in February 2012. At a two-day hearing in which it considered several motions, the trial court ruled, relevant to this appeal, that (1) the State's destruction of certain articles of the victim's bloody clothing early in the investigation did not warrant suppression of all DNA evidence in the case, (2) Cruthirds had failed to present a sufficient foundation to introduce evidence of an alternative suspect, and (3) Lessard's videotaped interview with Jones was admissible as a recorded recollection pursuant to Rule 803(5).

[¶ 12] The case went to trial in August 2013. The jury returned a verdict of not guilty on a charge of attempted murder and verdicts of guilty on elevated aggravated assault, burglary, and violating a condition of release. The court dismissed two other counts. At a sentencing hearing, the court entered judgment and imposed a sentence for elevated aggravated assault of twenty-eight years' imprisonment, with all but twenty-two years suspended, and four years of probation; it also imposed concurrent sentences of five years for burglary and six months for violation of bail conditions.

[¶ 13] This appeal followed.

## II. DISCUSSION

[¶ 14] Cruthirds advances several grounds that he contends require us to vacate the judgment. We address his arguments in turn.

### A. Admission of Lessard's Interview as a Recorded Recollection

[¶ 15] At the pretrial hearing, Karie Lessard professed a total lack of memory concerning the day the victim was attacked, as well as the days preceding and following it. When the audiotape of the victim's 911 call and the video of her own interview with Detective Jones were played for her, Lessard acknowledged that she was the person being interviewed, but said that she still did not remember the interview and still had no memory of what occurred in the victim's apartment. She suggested that her answers in the interview might not have been accurate because "we were always drunk all the time," and because "my mother told me that when I called her that all I wanted to do was go home and no one would let me go home." Lessard told the court, "I don't know if I was telling the truth or not."

---

**2.** Cruthirds is African–American.

[¶ 16] The court found that Lessard's testimony at the hearing that she may have had a reason to falsify her statement, and therefore the statement might not be accurate, was "not at all credible" and "entirely incredible." "We review the court's foundational findings or implicit findings to support admissibility of evidence for clear error, and we will uphold those findings unless no competent evidence supports the findings." *State v. Taylor*, 2011 ME 111, ¶ 20, 32 A.3d 440. Credibility determinations are "uniquely within the fact-finder's authority." *Pelletier v. Pelletier*, 2012 ME 15, ¶ 13, 36 A.3d 903.

[¶ 17] Lessard's videotaped interview was played for the jury at Cruthirds's trial over his objection. We have said that

> [p]ursuant to M.R. Evid. 803(5), a document or a recorded statement may be admitted as substantive evidence if the proponent of the statement demonstrates that: (1) the contents of the document or recording are a record of matters previously known to, and remembered by, the witness; (2) the record had been previously made, or adopted, by the witness, at a time when memory of the matters was then fresh; (3) at that past time, the record was remembered by the witness to be an accurate record of the matters described; and (4) the witness presently has no memory or insufficient memory of the subject matter of the statement.

*State v. Gorman*, 2004 ME 90, ¶ 27, 854 A.2d 1164. The declarant need not affirm anything about the prior statement at the time it is offered for it to be admissible at trial. When a witness is

> unable or unwilling to testify from present memory . . . it is within the discretion of the trial court to determine whether the foundational requirements

of Rule 803(5) have been satisfied on a case-by-case basis, whether by direct or circumstantial evidence. Accordingly, the criteria for admission of past recollection recorded may be established independent of the declarant's testimony as to present memory.

*Id.* ¶¶ 28–29 (quotation marks omitted). The court's determination that Lessard's videotaped interview was admissible as a recorded recollection is "deferentially reviewed" for an abuse of its "considerable discretion." *Id.* ¶ 29 (quotation marks omitted).

[¶ 18] Considering the four foundational requirements for admission pursuant to Rule 803(5) in turn, first, the trial court could find from the video that Lessard remembered the attack on the victim when she talked to Jones. During the interview Lessard was emotional but in control of her faculties, she spoke clearly and answered Jones's questions appropriately, and she described the events chronologically and in some detail—most notably in explicitly naming Cruthirds as the assailant. The victim's trial testimony confirmed that Lessard was in a position to see what she described in the interview. Furthermore, as the court noted, the version of events that Lessard gave Jones was consistent with the excited utterance that she made to the upstairs neighbor immediately after the event.

[¶ 19] Second, the interview was recorded only one hour after the attack—certainly a time when Lessard's memory was fresh. *See id.* ¶ 33 (stating that a two-month interval between an event and the recorded recollection was "significantly shorter than that found acceptable in other cases"). Third, the court found that "Lessard appear[ed] to be accurately stating what occurred" during the interview, and it completely rejected her suggestion at the pretrial hearing nineteen months later

that she might not have been doing so. Finally, Lessard claimed at the hearing and at trial to have no memory whatsoever of the attack. Whether her failure of memory resulted from past trauma that she had suffered or was attributable to intimidation, as the court feared, is of no import to our analysis. *See id.* ¶ 29 ("[T]he criteria for admission of past recollection recorded may be established independent of the declarant's testimony as to present memory.").

[¶ 20] Given this record, the court did not abuse its considerable discretion in finding that the foundational requirements of Rule 803(5) were satisfied, and on that basis admitting the video recording of Lessard's interview as substantive evidence. *See id.* ¶¶ 27, 29.

## B. Exclusion of Alternative Suspect Evidence

[¶ 21] Cruthirds contends on appeal that he should have been allowed to cross-examine the victim concerning her relationship with Deshawn, the father of her child, and then argue to the jury that Deshawn might have committed the crime. He asserts that the court's rulings barring him from doing so deprived him of an opportunity to present a complete defense and violated his Confrontation Clause rights. *See State v. Mitchell,* 2010 ME 73, ¶ 31, 4 A.3d 478 (recognizing that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense" (quotation marks omitted)). Cruthirds's argument was considerably less focused in the trial court than it is now, in that at trial he proposed several possible alternative suspects: Deshawn; another man who was purportedly a former dating partner of the victim; the victim's incarcerated husband (as an accomplice); unnamed "affiliates of [the victim's] husband"; and "people down in Boston" for whom the victim allegedly worked.

[¶ 22] The trial court's exclusion of alternative suspect evidence is reviewed for an abuse of discretion. *Id.* ¶ 23. "Courts will admit evidence regarding alternative suspects if (1) the offered proof is admissible at trial, and (2) the admissible evidence is of sufficient probative value to raise a reasonable doubt as to the defendant's culpability by establishing a reasonable connection between the alternative suspect and the crime." *Id.* ¶ 25 (quotation marks omitted).

[¶ 23] Although evidence "clearly linking" the proposed alternative suspect to the crime is not required,

[a] defendant may not ... without evidence of a connection between the alternative suspect and the crime, use the trial process to question witnesses in hopes of eliciting information that would convert what amounts to speculation into a connection between the other person and the crime. We will uphold the exclusion of evidence if it is too speculative or conjectural or too disconnected from the facts of a defendant's prosecution.

*Id.* ¶¶ 27–28 (emphasis and quotation marks omitted); *see also State v. Dechaine,* 572 A.2d 130, 134 (Me.1990) (stating that evidence of an alternative suspect "must be more than speculative and conjectural" and "more than a mere suspicion that such other person committed the crime" (alteration and quotation marks omitted)).

[¶ 24] Here, the only connection between Deshawn and the attack on the victim was established in the victim's testimony that (1) he was her baby's father; and (2) he told her in a Facebook message on the evening of the assault that he had come to her door earlier, knocked, and left when no one answered; the victim ex-

plained that she was not home two hours before the assault because she had gone to the store. In contrast, the victim's testimony, the recording of her 911 call, and the recording of Lessard's police interview all explicitly named Cruthirds as the assailant, and DNA evidence corroborated those statements. In short, nothing beyond Cruthirds's speculation suggests that Deshawn had any involvement in the crime. The record here falls well short of the showing required to admit evidence of an alternative suspect.

[¶ 25] Turning to Cruthirds's Confrontation Clause argument,[3] in *Mitchell* we noted that

> well-established rules of evidence that permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury do not normally breach defendants' constitutional rights, and ... one such well-established rule is the rule that a court may exclude a defendant's evidence proffered to show that someone else committed the crime in question if that evidence is too speculative, remote, or immaterial. Thus, the Constitution does not prevent a court from reasonably regulating the admission of alternative suspect evidence so long as it serves a legitimate purpose, such as the goal of focusing the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues.

2010 ME 73, ¶ 33, 4 A.3d 478 (alterations, citations and quotation marks omitted). That is the case here, given the "too speculative [and] remote" evidence of Deshawn's connection to this crime. *Id.*

[¶ 26] Because the trial court correctly found that the asserted connection between Deshawn and the attack on the victim was too speculative to put before the jury, it did not abuse its discretion in barring Cruthirds from arguing that Deshawn was an alternative suspect. *See id.* ¶ 52 (Silver, J., dissenting) (collecting cases where alternative suspect evidence was properly excluded).

C. The State's Failure to Preserve Evidence

1. Destroyed Clothing

[¶ 27] The Lewiston Police Department preserved the shirt that the victim was wearing on the night she was assaulted. Cruthirds designated several areas of the shirt for analysis by the State Police crime laboratory and utilized the PSA found on it to argue to the jury that another male could have committed the crime. The police decided that other items of the victim's clothing—her bra, underwear, sweatpants, and a sanitary pad—were unnecessary to the investigation and destroyed them about eight days after the assault. At a pretrial hearing, although the court agreed with Cruthirds that "in the future if a similar circumstance arises [the police] should take steps to try to preserve evidence in a situation like this," it denied Cruthirds's request to exclude all of the State's DNA evidence as a sanction after finding that there was no credible issue of an alternative suspect at the time, and therefore the clothing had no apparent exculpatory value and the police did not act in bad faith in destroying it.

[¶ 28] Cruthirds contends that by destroying the victim's clothing the State deprived him of due process, and

---

**3.** The Sixth Amendment to the United States Constitution and article I, section 6 of the Maine Constitution guarantee criminal defendants the right to confront witnesses against them.

consequently the court erred in not excluding the State's DNA evidence. Whether Cruthirds's due process rights were violated is a question of law reviewed de novo. *Friends of Maine's Mountains v. Bd. of Envtl. Prot.,* 2013 ME 25, ¶ 11, 61 A.3d 689.

[¶ 29] In *State v. Bilynsky* we said:
We have adopted the United States Supreme Court's analysis to determine when the destruction of evidence violates a defendant's right to due process of the law. In *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the [Supreme] Court fashioned a two-part test to determine whether a defendant's right to due process is violated by the failure to preserve evidence, (1) the evidence must possess an exculpatory value that was apparent before the evidence was destroyed; and (2) the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.
2007 ME 107, ¶ 41, 932 A.2d 1169 (citations and quotation marks omitted). We have also discussed a third element: whether "the State acted in bad faith in failing to preserve potentially useful evidence." *State v. Kremen,* 2000 ME 117, ¶ 15, 754 A.2d 964 (quotation marks omitted) ("All three elements must be present in order for [a defendant's] right to a fair trial to be found to have been violated."); *see also State v. St. Louis,* 2008 ME 101, ¶ 7, 951 A.2d 80 (concluding that the trial court correctly found that the defendant failed to show the State's bad faith); *State v. Lewis,* 584 A.2d 622, 625 (Me.1990).

[¶ 30] Here, the trial court found that the second element of the *Trombetta* test was satisfied, in that Cruthirds could not replicate whatever evidence might have been obtained from the destroyed items. The court found that Cruthirds did not establish the remaining two elements, however, namely that the destroyed articles of clothing had then-apparent exculpatory value, and that the State acted in bad faith. *See St. Louis,* 2008 ME 101, ¶ 7, 951 A.2d 80 (concluding that the trial court correctly found that the defendant failed to show evidence of exculpatory value or bad faith). The court's finding that the clothing had no apparent exculpatory value is reviewed only for clear error. *Lewis,* 584 A.2d at 625.

[¶ 31] The court's findings are supported by the record. Both the detective who made the decision to destroy the items and the Lewiston Police Department evidence manager, a veteran former police officer, testified at the pretrial hearing that given the positive identification of Cruthirds as the assailant, there was no thought of an alternate suspect at the time the decision was made. The evidence manager explained that drying space for storing bloody items in the evidence room was very limited, and therefore he decided that once investigators determined which articles of the victim's clothing were necessary to the case, unneeded items should be disposed of to make space and to prevent the risk of cross-contamination of whatever was retained.

[¶ 32] Given this record, Cruthirds did not meet his burden to show that the destruction of the victim's clothing (apart from her shirt, which was preserved for his use) violated his right to due process, because nothing beyond bare speculation pointed to an alternative suspect, and both the victim and an eyewitness had identified Cruthirds as the victim's attacker. Accordingly, it was not clear error for the court to find that the clothing had no apparent exculpatory value when it was destroyed, or to find that the State did not act in bad faith.

[¶ 33] That said, we note that although the destruction of some of the victim's clothing did not violate Cruthirds's right to due process in this case, we agree with the trial court's observation that law enforcement's decision to do so was ill-advised. We are mindful of the fact that it is unreasonable and unrealistic to expect police departments to maintain every bit of property that may be obtained in every criminal investigation, and our decision today does not impose such an obligation. However, given the often critical nature of DNA evidence in criminal cases and the rapid advancement in DNA technology, it is not always possible to determine what is of importance in the early stages of a criminal investigation. Prudence suggests that as a best practice law enforcement agencies should endeavor to preserve potential DNA evidence, or obtain the advice of the State's attorney before destroying it. That level of caution is particularly appropriate in very serious cases such as this one.

### 2. Lost Witness Statements

[¶ 34] After the trial was well underway, the prosecutor learned that the Lewiston Police Department had obtained written statements from three bouncers who were at the nightclub where Cruthirds arrived shortly after the assault. The Department lost the statements before they were delivered to the prosecutor, and consequently they were not produced in discovery. *See* M.R.Crim. P. 16(b)(2)(D). The trial court denied Cruthirds's motion for a dismissal of the case as a result of the discovery violation, but ruled that Cruthirds would be allowed "on cross-examination to bring out the failure of discovery."

[¶ 35] Two of the bouncers testified at trial. When the first took the stand, the court advised the jury:

> [B]efore this testimony begins ... [the witness] gave a written statement to the police and that statement—the State is obligated under the rules of discovery that apply in these criminal cases to turn that over to the defendant ... [and] the police failed to turn that over to the district attorney and the district attorney's office through whom discovery goes did not turn this information— the statement over to the defendant.
>
> And the Lewiston Police ... up to now has not been able to locate that statement and that is a violation of their discovery ... obligation ... I'm letting you know that that's what has occurred in this case with this statement.... It was ... not turned over, and they are unable to locate that statement now.

The court then gave a similar advisement before the second bouncer testified. Cruthirds cross-examined both bouncers concerning their written statements and whether their memory was fresher when they made them shortly after the events occurred.

[¶ 36] In reviewing its instructions with the parties before charging the jury, the court informed them that

> the Court as a sanction is going—in reviewing the ... instructions to the jury on how they consider evidence and witnesses, the Court is going to mention that ... the jury can take into consideration how the evidence and the investigation was handled in this case to allow the defense to comment on it and the State as well in closing arguments.

The court then instructed the jury that "one of the things you can consider in evaluating the case is ... the nature of the investigation that took place and you can consider that in evaluating the testimony of the witnesses who participated in that investigation."

[¶37] "We ... recognize[ ] that the trial court has the discretion to determine what, if any, sanction is appropriate for a discovery violation .... When the trial court does exercise its discretion and [imposes a] sanction ... we review that decision for an abuse of discretion." *State v. Allen*, 2006 ME 20, ¶ 12, 892 A.2d 447 (citation omitted). "When due process is implicated, we review such procedural rulings to determine whether the process struck a balance between competing concerns that was fundamentally fair." *In re A.M.*, 2012 ME 118, ¶ 14, 55 A.3d 463 (quotation marks omitted). Before a new trial is required, however, "[t]he discovery violation must prejudice the defendant to the extent that it deprived him of a fair trial." *State v. Reese*, 2010 ME 30, ¶ 14, 991 A.2d 806.

[¶ 38] Here, the court imposed a significant sanction for a point in relatively little dispute, namely the earliest time that Cruthirds could have arrived at the club on the night that the victim was attacked. Cruthirds told Detective Jones that he was the first person to arrive at the club at 9:00 p.m., "if that." One of the bouncers testified that the club did not open until 9:00 p.m.; he said that Cruthirds came in fifteen minutes later after he had time to finish stocking the bar and started playing pool, although on cross-examination he said that it could have been as late as 9:30 p.m. when Cruthirds arrived. The other bouncer testified that when he arrived for work sometime between 9:30 and 9:45 p.m., Cruthirds was already there. Neither witness suggested that Cruthirds could have been at the club at 9:00 p.m. or earlier, as he claimed.

[¶ 39] Given this record, the State's failure to produce the bouncers' written statements in discovery—which we do not minimize—was not so serious as to deprive Cruthirds of a fair trial, and the court's significant sanction for the State's discovery violation, which was to give the jury a court-sanctioned reason to question the validity of the police investigation if it so chose, was not an abuse of its discretion.

D.  Jury Instructions

[¶ 40] Cruthirds proposed as a jury instruction:

> If a person fails to preserve or allows the destruction of material evidence which is under his or her control, you may consider the reasons for that failure to preserve the evidence and, if you believe it is proper, you may infer that the evidence is unfavorable to the person or party who could have preserved it and did not preserve it.

The court declined to give the instruction as proposed. "We review the denial of a requested jury instruction for prejudicial error, and will vacate a judgment on this basis only when the denied instruction (1) stated the law correctly; (2) was generated by the evidence in the case; (3) was not misleading or confusing; and (4) was not sufficiently covered in the instructions the court gave." *State v. Ouellette*, 2012 ME 11, ¶ 7, 37 A.3d 921 (quotation marks omitted).

[¶ 41] Cruthirds's argument that the court erred in declining to give the instruction he requested is unpersuasive for two reasons. First, he has not established that the proposed instruction states the law correctly, given the absence of any precedent of this Court to support it. Second, he has not shown that the substance of the instruction was not otherwise covered in the instructions the court gave. The court told the jury twice that the State had committed a discovery violation, and it instructed that "one of the things you can consider in evaluating the case is ... the nature of the investigation that took place and you can consider that in

evaluating the testimony of the witnesses who participated in that investigation." That is another way of saying essentially what Cruthirds proposed—the jury could draw inferences that it deemed appropriate from the State's failure to preserve evidence.

### E. Cruthirds's Use of the 911 Tape

[¶ 42] Cruthirds contends that his Confrontation Clause rights were violated when the court permitted him to initially cross-examine Detective Jones concerning his recollection of the tape of the victim's 911 call, and whether the tape raised any concerns about her credibility or competence due to intoxication, but did not permit him to play the tape for Jones at that point in the trial. The court, citing judicial economy, advised Cruthirds that if he wished he would be allowed to recall Jones for continued cross-examination after the State played the tape as part of its case-in-chief. Cruthirds did not recall Jones after the tape was played during the victim's testimony.

[¶ 43] We have said, "A trial justice has considerable discretion in managing the conduct of the trial. Absent an abuse of discretion, which interferes with the rights of a party to a fair trial, we will uphold the trial court's decisions concerning the scope and manner of examination of witnesses." *State v. McKenna*, 1998 ME 49, ¶ 3, 707 A.2d 1309; *see* M.R. Evid. 611(a) (stating that "[t]he court shall" control a trial "so as to . . . avoid needless consumption of time"). Here, the court did not bar Cruthirds from cross-examining Jones concerning the 911 tape; indeed, it explicitly allowed him to do so. The court decided only that instead of the tape being played twice during the presentation of evidence, it would be played once, and then Cruthirds, at his election, could recall and continue cross-examining Jones. That ruling was not an abuse of the court's "considerable discretion," *see McKenna*, 1998 ME 49, ¶ 3, 707 A.2d 1309, because Cruthirds had a full opportunity to confront both Jones and the victim with the tape in any permissible way that he wished.

The entry is:

Judgment affirmed.