MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2015 ME 22
Docket:        Aro-14-31
Argued:        November 5, 2014
Decided:       March 10, 2015

Panel:      SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and JABAR, JJ.[*]


STATE OF MAINE

v.

GEORGE JAIME


SAUFLEY, C.J.

[¶1]  In the fall of 1998, thirty-nine-year-old Starlette Vining went missing. Her absence was not reported to authorities until 2006.  On July 12, 2012, George Jaime was charged with Vining's murder.  A jury found Jaime guilty, and he appeals from the resulting judgment of conviction of intentional or knowing murder, 17-A M.R.S. § 201(1)(A) (2014), entered by the trial court (*R. Murray, J.*).

[¶2]  Jaime raises several arguments on appeal.  We focus on his arguments that the court erred in admitting prior consistent statements of Jaime's son, Ted Jaime, and that the court abused its discretion in preventing Jaime from presenting evidence that would have provided additional support implicating his son as an alternative suspect.  Although we conclude that the court's application of

---

[*]  Silver, J., sat at oral argument and participated in the initial conference but retired before this opinion was adopted.

2

alternative suspect jurisprudence reflected a misapprehension of the concept, we determine that the court's error was harmless. We affirm the judgment.

## I. BACKGROUND

[¶3] The prosecution in this case presented a "cold case" charge of a murder committed fifteen years before the trial. "Viewing the evidence in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt." *State v. Haag*, 2012 ME 94, ¶ 2, 48 A.3d 207.

[¶4] In 1998, George Jaime was a local businessman who owned a commercial building in Presque Isle that housed a pawnshop, a wine shop, and several apartments. Jaime was involved in a romantic relationship with Starlette Vining. During the late summer or early autumn of 1998, Jaime and Vining lived together in an apartment on the ground floor of the building.

[¶5] One night in October 1998, Jaime arrived distraught and intoxicated at the house of his adult son Ted Jaime.[1] Ted observed that Jaime "had scratches and blood on him." Jaime told Ted that "something bad had happened, he had done something bad." Ted told his then-fiancée, Parise Voisine, whom he lived with at the time, that he was leaving, and he took Jaime back to Jaime's apartment. When Ted walked inside Jaime's apartment, he saw Vining's body on the floor. The

---

[1] For clarity, we will refer to Ted Jaime as "Ted" throughout this opinion. We intend no disrespect by the informality.

body looked lifeless and appeared to have multiple stab wounds.  Ted covered the body with a blanket, left Jaime's apartment, and walked to the house of his longtime friend James Campbell.

[¶6]  When Ted arrived at Campbell's house, he had blood on his shirt. Campbell gave him a fresh shirt to change into.  Thereafter, Ted disclosed to Campbell what he had seen at Jaime's apartment.  Campbell agreed to go to Jaime's apartment the next day to help Ted "clean up the mess."  When Ted and Campbell arrived at Jaime's apartment the following day, they found that Jaime had wrapped Vining's body in a tarp and moved it into the basement of the building, which housed several boilers.  Ted and Campbell then began cleaning the apartment.  They cleaned blood off of the bathroom walls, removed the carpeting where Vining's body had first lain, removed some of the sub-flooring under the carpet, replaced ceiling tiles, and washed everything down with bleach and water.

[¶7]  Jaime did not speak about what had happened until one day approximately a month later when he drove with Ted to a stream in Westfield, bringing with him a large container full of ashes.  Jaime poured the ashes into the stream, telling Ted that they were Vining's ashes and that when he died he wanted to be cremated so that his remains could be scattered in the same spot.  At some point, Jaime told Campbell that, after he had killed Vining, he had cut up her body and burned it.

4

[¶8] Over the following years, Jaime moved into a different apartment unit and continued to run his business as usual. Jaime eventually told Ted that on the night of the murder, Jaime and Vining had gotten into a fight because Vining had told him that she was going to leave him. Jaime then stabbed Vining with a Marine Corps Ka-bar knife and, when she started screaming, he hit her with the butt of the knife to knock her out. Over the years, Ted told several people— including his mother, Ethel Jaime; his two brothers and two sisters; Voisine; and Campbell—what Jaime had done.

[¶9] It was not until 2006 that Vining was reported missing by her family and the police initiated an investigation into her disappearance.[2] The police could not find any record of Vining after October 1998. Between 2006 and 2012, the investigation was at an impasse.

[¶10] Sometime around March 2012, the police were contacted by someone who told them that Parise Voisine, Ted's former fiancée, may have information about Vining. After interviewing Voisine, who was by then Ted's ex-wife, the police attempted to track down both Ted and Campbell. In June 2012, Campbell disclosed what he knew about the circumstances surrounding Vining's murder. It took the police a longer time to track down Ted.

---

[2] Vining's mother died in 2006, and the State was unable to locate Vining as her next of kin.

[¶11] While the investigation was underway and the police were starting to ask more questions in and around the Presque Isle area, Jaime called a family meeting with his three sons, including Ted, and his ex-wife, Ethel. At the meeting, Jaime told his children to "keep their mouths shut" and asked Ted to "disappear for awhile." Ted left for the Southern Maine/New Hampshire area but soon returned. At some point during this time, Ted was charged with domestic violence assault in Aroostook County, and he was released on bail with conditions that included no contact with his girlfriend. In early July 2012, Ted was again charged with domestic violence assault and with violating the conditions of his release, and the police arrested him.

[¶12] On July 5, 2012, before placing Ted under arrest, the police questioned Ted about Vining's disappearance. He denied having any knowledge about Vining. Ted again denied any knowledge about the circumstances of Vining's disappearance when he was questioned by law enforcement on July 9, 2012, while he was in the Aroostook County Jail. Ted's attorney then advised him that he would receive more favorable treatment from the prosecution if he cooperated. On July 11, 2012, Ted disclosed what he knew about the murder.

6

[¶13]  The police obtained and executed two search warrants—one for Jaime's current apartment and one for his old apartment.[3]  While executing the second search warrant, the Evidence Response Team used Hema-stix and Luminol, both chemical agents designed to test for the presence of latent bloodstains, to search for evidence of Vining's blood.  Samples were collected from the places in the apartment where preliminary testing suggested the possible presence of blood.  Further test results could neither confirm nor rule out the presence of human blood on any of the samples.

[¶14]  On July 12, 2012, Jaime was arrested and a criminal complaint was filed.  On September 6, 2012, the grand jury issued an indictment charging Jaime with the intentional or knowing murder of Starlette Vining between October 1 and October 20, 1998.  *See* 17-A M.R.S. § 201(1)(A).  Jaime entered a not guilty plea and proceeded to trial.

[¶15]  At trial, Ted testified that he was at Jaime's apartment on the night of the murder, that he helped clean up evidence of the crime, and that he was present when Jaime dumped Vining's ashes in a stream.  He also testified that he had used drugs with Vining, but he denied having had a sexual relationship with her.

---

[3]  Jaime originally told the police that the apartment he was currently residing in was the same one that he had lived in in 1998.  During Ted's July 11 interview, however, Ted disclosed to the police that Jaime's current apartment was not the apartment in which the murder had occurred.  On this information, the police obtained and executed the second search warrant.

[¶16]   When cross-examining Ted, Jaime's counsel asked questions that suggested that Ted had implicated his father in the murder only after the State promised leniency in relation to his involvement with the murder and his pending criminal charges.   To rebut this implied charge of recent fabrication or improper motive, the State offered Ted's prior consistent statements through the testimony of Campbell, Voisine, Ethel, and one of Ted's brothers.   Those witnesses testified that, long before Ted was arrested for domestic violence assault and violating the conditions of his release, he had said that Jaime was to blame for killing Vining or for her disappearance.   Jaime repeatedly objected to the testimony.   The court gave a limiting instruction to the jury on these prior consistent statements, instructing the jury to consider the statements only for the purpose of rebutting the implied charge of recent falsification or improper motive to lie.

[¶17]   While cross-examining Voisine at trial, Jaime's attorney asked her about Ted's alleged sexual relationship with Vining.   The State objected to the proffered testimony as irrelevant hearsay.   Jaime argued that it was relevant to support an alternative suspect defense,[4] even though he anticipated that Voisine would say that she was unaware of any sexual relationship between Ted and Vining.   After arguments of counsel, the court, citing *State v. Dechaine*, 572 A.2d

---

[4]   Before trial, the State moved to exclude any evidence of an alternative suspect on the ground that this evidence was merely speculative.   The court deferred ruling on the motion until trial.

130 (Me. 1990), sustained the State's objection, determining that the evidence of blood on Ted's shirt, Ted's drug use with Vining, and the disputed testimony about a sexual relationship with Vining did not meet the threshold for relevance necessary to offer facts regarding Ted as an alternative suspect. The court concluded that all of the facts taken together did not amount to "more than . . . mere speculation."

[¶18]  Later, Jaime again offered evidence relating to an alternative suspect defense by asking Jaime's daughter (Ted's sister) about Ted's alleged sexual relationship with Vining.  After the State objected, the court sustained the objection as it related to an alternative suspect defense but allowed the question to be asked and answered for impeachment purposes.  Thereafter, Jaime's daughter testified that Ted had told her that he had engaged in sexual relations with Vining.

[¶19]  After deliberating, the jury returned a verdict of guilty, and the Superior Court sentenced Jaime to forty years' imprisonment.  After the court denied Jaime's motion for a new trial, *see* M.R. Crim. P. 33, he timely appealed pursuant to 15 M.R.S. § 2115 (2014) and M.R. App. P. 2(b)(2)(A).

## II. DISCUSSION

[¶20]  We are unpersuaded by Jaime's arguments that the court abused its discretion in admitting evidence of the Luminol test results, which suggested, but standing alone did not prove, the presence of human blood, *see State v. Gurney*,

2012 ME 14, ¶ 41, 36 A.3d 893, and that the prosecutor committed prosecutorial misconduct in his closing argument to the jury, *see State v. Clark*, 2008 ME 136, ¶¶ 12-14, 954 A.2d 1066. We do not discuss these arguments further.

[¶21] We focus on Jaime's arguments that the court erred in admitting Ted's prior consistent statements and that the court abused its discretion in preventing him from presenting additional evidence of Ted's involvement with the murder to support an alternative suspect defense. We address each argument in turn.

A.    Prior Consistent Statements

[¶22] Asserting that Ted's prior consistent statements to family and friends regarding details of the murder were inadmissible hearsay, Jaime argues that the statements were not admissible to rebut an implied charge of fabrication or improper motive because (1) the improper motive to lie existed back in 1998 and (2) Ted's prior statements were not consistent with his in-court testimony.[5] We review for clear error the admissibility of hearsay evidence that is dependent on a factual determination, "such as whether the opposing party has . . . implicitly

---

[5]  Jaime also argues that the prior consistent statements "involved multi-level hearsay" because they involved Ted repeating statements that Jaime had made to him. Because the first level of the "out of court statement" involved statements Jaime made to Ted, that level is considered an admission by a party-opponent and is not hearsay. *See* M.R. Evid. 801(d)(2). We also note that the Rules of Evidence have been restyled effective January 1, 2015. We cite to the Rules of Evidence in effect at the time of trial in this opinion.

charged recent fabrication or improper influence or motive . . . ." *State v. Parsons*, 2005 ME 69, ¶ 10, 874 A.2d 875. The determination of exactly when the motive to fabricate arose is left to the sound discretion of the trial court. *State v. Roberts*, 2008 ME 112, ¶ 38, 951 A.2d 803.

[¶23] Maine Rule of Evidence 801(d)(1) excludes from the definition of hearsay prior consistent statements by a declarant if the statements are offered "to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." "The existence of an implied charge of recent fabrication or improper motive must be apparent from the evidence" or from inferences that may fairly arise from the evidence, including cross-examination of the declarant. *State v. Zinck*, 457 A.2d 422, 426 (Me. 1983). The party offering the prior consistent statement "'has the burden of establishing that the statement was (1) consistent with the in-court statement of the witness, (2) offered to rebut an express or implied charge of recent fabrication or improper influence, and (3) made prior to the time the supposed motive to falsify arose.'" *Roberts*, 2008 ME 112, ¶ 38, 951 A.2d 803 (quoting *State v. Weisbrode,* 653 A.2d 411, 415 (Me. 1995)).

[¶24] Through counsel, Jaime repeatedly questioned Ted about the timing of Ted's July 2012 jailhouse disclosure about Vining's death. Specifically, Jaime asked why Ted had not mentioned anything about Vining's murder when law enforcement officers questioned him on July 5 and July 9. In so doing, Jaime

implied that Ted had fabricated the details about the murder on July 11 to secure a deal that immunized him from any charges relating to his involvement with the murder, reduced the severity of his pending assault charges, and enabled him to post bail and be released from jail.

[¶25] To rebut Jaime's implied charge of recent fabrication and improper motive, the State elicited testimony from Ted on redirect that, well before July 11, 2012, Ted had told family and close friends what his father had done. After Ted's testimony, the State offered Ted's prior consistent statements through the testimony of several other witnesses. Through their testimony, the State established that the prior consistent statements, many of which were made in 1998 and the following year, significantly predated the July 11, 2012, disclosure to law enforcement. Moreover, each witness's testimony was consistent with Ted's in-court testimony.

[¶26] Thus, the court did not err in finding that Jaime had implicitly charged Ted with fabricating his version of events, nor did the court abuse its discretion in determining that the alleged motive to fabricate was recent, arising on July 11, 2012, when Ted disclosed his knowledge of the murder to law enforcement in exchange for leniency. The record further confirms that the court did not err in finding that Ted's statements, most of which were made years before the trial, were consistent with his in-court testimony.

12

B.    Alternative Suspect Evidence

[¶27]    Jaime next asserts that the trial court abused its discretion in preventing him from presenting certain evidence to implicate Ted as an alternative suspect, thus precluding him from presenting a complete defense.  We take this opportunity to address apparent confusion regarding an "alternative suspect defense."

[¶28]  When analyzing a defendant's claim of a "defense," it is important to recognize the distinctions among several different types of defenses in criminal matters.  We begin our discussion by reviewing the "three broad categories of criminal defenses"—affirmative defenses, justification defenses, and failures of the State's proof—"that differ primarily based on the allocation of the parties' respective burdens." *State v. Ouellette*, 2012 ME 11, ¶ 8, 37 A.3d 921.

[¶29]  An "affirmative defense" is typically identified expressly by statute. *See, e.g.*, 15 M.R.S. § 1092(2) (2014) (affirmative defense to violation of condition of release); 17 M.R.S. § 1033(3) (2014) (affirmative defense to the crime of animal fighting); 17-A M.R.S. § 39(3) (2014) (affirmative defense of "[l]ack of criminal responsibility by reason of insanity"); 17-A M.R.S. § 1105-C(1)(K), (L), (3) (2014) (affirmative defenses to aggravated furnishing of scheduled drugs).  By its nature, an affirmative defense is presented where the elements of the crime are not necessarily contested, but the defendant offers additional facts that may legally

absolve him of criminal liability. In contrast to the two other categories of defenses, "[w]hen a defendant raises an affirmative defense, the *defendant* bears the burden of proving the facts necessary to the affirmative defense by a preponderance of the evidence." *State v. LaVallee-Davidson*, 2011 ME 96, ¶ 14, 26 A.3d 828 (emphasis in original); 17-A M.R.S. §101(2) (2014).

[¶30] Justification defenses are also typically identified expressly by statute. *See, e.g.*, 17-A M.R.S. § 108 (2014) (self-defense justification); 17-A M.R.S. § 103-A (2014) (duress justification). A defendant asserting a justification defense has the initial burden of production to generate the issue. *See* 17-A M.R.S. § 101(1) (2014). If the defendant introduces evidence "sufficient to make the existence of all the facts constituting the [justification] defense a reasonable hypothesis for the factfinder to entertain," *State v. Glidden*, 487 A.2d 642, 644 (Me. 1985); *see State v. Delano*, 2015 ME 18, ¶ 25, --- A.3d ---, the State must disprove the defense beyond a reasonable doubt. *See* 17-A M.R.S. § 101(1). As with any criminal prosecution, the State must prove each element of the crime charged beyond a reasonable doubt before the fact-finder would be called upon to determine whether the State has met its burden of disproving a defendant's justification defense.

[¶31] An alternative suspect defense falls into the third and most commonly presented type of defense. It is neither an affirmative defense nor a justification

defense. Simply put, an alternative suspect defense falls within that type of defense through which the defendant "argues that there is a failure of proof by the State, that is, that the State has failed to meet its burden to establish beyond a reasonable doubt one or more of the elements of the crime charged." *LaVallee-Davidson*, 2011 ME 96, ¶12, 26 A.3d 828. An alternative suspect defense, like others in its category, is not technically a "defense" at all; it is simply an evidentiary method utilized by a defendant to demonstrate reasonable doubt as to an element of the crime—here, reasonable doubt that it was the defendant who committed the crime. Specifically, an alternative suspect defense is raised when a defendant argues to the fact-finder that, because another person may have committed the crime, there exists a reasonable doubt that *this* defendant committed the crime.

[¶32] When a defendant generates an alternative suspect defense, the burden does not shift to the State to prove that the alternative suspect *did not* commit the crime. Similarly, the defendant does not have any burden to prove, by a preponderance of the evidence or otherwise, that the alternative suspect *did* commit the crime. As in all criminal cases, the State's burden remains the same throughout the trial—to prove beyond a reasonable doubt all elements of the crime charged, including that the defendant committed the crime.

[¶33]  Alternative suspect evidence offered by the defendant, as with any evidence, must be sufficiently probative to be relevant and thus admissible.  *See* M.R. Evid. 401, 402.  "For alternative [suspect] evidence to have sufficient probative value to raise a reasonable doubt as to the defendant's culpability, it must be more than speculative and conjectural."  *Dechaine*, 572 A.2d at 134 (citation omitted) (quotation marks omitted).  Evidence that is speculative or conjectural is not probative and is therefore not relevant.  *See id.*; *State v. Cruthirds*, 2014 ME 86, ¶ 23, 96 A.3d 80; *State v. Mitchell*, 2010 ME 73, ¶ 28, 4 A.3d 478.

[¶34]  Thus, evidence regarding an alternative suspect will be admitted at trial if (1) the proffered evidence is otherwise admissible, and (2) "the admissible evidence is of sufficient probative value to raise a reasonable doubt as to the defendant's culpability by establishing a reasonable connection between the alternative suspect and the crime."  *Cruthirds*, 2014 ME 86, ¶ 22, 96 A.3d 80 (quotation marks omitted).  Although a reasonable connection is required, "[a] defendant may establish a reasonable connection between the alternative suspect and the crime without *clearly linking* the alternative suspect to the crime."  *Mitchell*, 2010 ME 73, ¶ 27, 4 A.3d 478 (emphasis in original).  Because a trial court must determine both the preliminary admissibility of the evidence and the existence of a reasonable connection between the alternative suspect and the crime,

16

we review a trial court's decision to admit or exclude evidence to support an alternative suspect defense for an abuse of discretion. *Id.* ¶ 23.

[¶35]  Here, extensive evidence regarding Ted's connection to the crime was offered, in great part by the State, throughout the trial.  The court took no action to exclude that evidence, nor did either party seek to have it excluded.  Only when Jaime twice sought to establish another connection between Ted and Vining—that is, the potential sexual relationship between the two—did the State object.  The court determined that two pieces of evidence were too speculative to admit in support of an alternative suspect defense: (1) the proffered testimony of Voisine that she was unaware of any sexual relationship between Ted and Vining; and (2) the testimony of Jaime's daughter that Ted had disclosed to her that he had engaged in sexual relations with Vining.  Voisine's testimony on this subject was excluded in its entirety. The daughter's testimony, however, although specifically excluded to support an alternative suspect defense, was admitted for the limited purpose of impeaching Ted, who had testified that he did not have a sexual relationship with Vining.

[¶36]  When making its determination on the admissibility of Voisine's testimony, the court, citing *Dechaine*, concluded that the evidence presented did "not create the type of competent evidence or substantive facts that create[s] more than a mere speculation at this juncture."  With due respect to the trial court's

advantage in viewing all of the evidence in context, the evidence at trial created a connection between Ted and the crime that went beyond mere speculation. Ted admitted to being at the scene of the crime on the night of the murder; to occasional drug use with Vining; to soliciting help from his longtime friend Campbell to help clean up the evidence of Vining's violent death; and to accompanying Jaime when he scattered Vining's remains in a stream. Campbell's testimony that Ted showed up at his house on the night of the murder with fist-sized bloodstains on his shirt, seeking help to conceal a violent, bloody, fatal assault, creates a similar reasonable connection to the crime.

[¶37] The proffered evidence from Voisine and from Jaime's daughter suggesting that Ted may have lied to his then-fiancée about a sexual relationship with a woman whom his father was living with at the time would have augmented the connection that the evidence had already shown. That proffered evidence could have strengthened Jaime's argument that Ted had both the motive and opportunity to commit the murder. Based on the existing reasonable connection between Ted and the murder, established by both the State and Jaime, these two pieces of evidence were sufficiently probative to raise a reasonable doubt as to Jaime's culpability, and Jaime should have been allowed to offer the evidence to the jury. Thus, the court abused its discretion in precluding Jaime from offering

18

evidence of Ted's alleged sexual relationship with Vining to support an alternative suspect defense.

[¶38]  We must therefore determine whether the court's error was harmless. An error is harmless when it is highly probable that it did not affect the jury's verdict.  *See* M.R. Crim. P. 52(a); *State v. Dolloff*, 2012 ME 130, ¶¶ 33-34, 58 A.3d 1032.  In contrast, "[h]armful error is error that affects the criminal defendant's substantial rights, meaning that the error was sufficiently prejudicial to have affected the outcome of the proceeding."  *Id.* ¶ 33 (citations omitted) (quotation marks omitted).

[¶39]  The court's evidentiary rulings related to Ted's possible sexual relationship with Vining were very limited in the context of this lengthy trial. Although the court ruled that Jaime could not solicit testimony from Voisine that she was unaware of any sexual relationship between Ted and Vining, the court admitted testimony from Jaime's daughter about Ted's relationship with Vining for the purpose of impeachment.  The jury therefore heard from Jamie's daughter—in contradiction to Ted's testimony—that Ted and Vining had engaged in a sexual relationship.

[¶40]  Accordingly, although the court may have misunderstood the evidentiary threshold for permitting a defendant to offer evidence in support of an alternative suspect defense, the jury heard extensive evidence connecting Ted with

this crime—including conflicting evidence about a sexual relationship. It is therefore highly probable that the court's limited evidentiary errors did not affect the jury's verdict, *see State v. Stanley*, 2000 ME 22, ¶ 12, 745 A.2d 981, and any error was therefore harmless.

[¶41] Jaime argues that the court's error cannot be harmless because it prevented him from presenting a complete defense. He argues that, because the court rejected his attempts to offer evidence of Ted's sexual relationship with Vining, he was precluded from "vigorously arguing [that Ted] had the motive to commit the murder and later blame his father." We find no evidence of such a limitation in the record.

[¶42] As the trial concluded, the jury had before it a record replete with testimony regarding Ted's connection to the murder. The record does not contain any indication that the court prevented Jaime from *arguing* that Ted was an alternative suspect based on the incriminating evidence that *was* admitted. There were multiple instances during the trial when Jaime suggested to the jury that his son may have been the perpetrator in this case without objection from the State or constraint by the court. For example, Jaime repeatedly directed the jury's attention to the inconsistencies in Ted's story, the toxic relationship that Ted had with both Jaime and Vining, and the possible motives that Ted may have had to lie about Jaime's guilt. In Jaime's closing argument, he pointed out that Ted has a known

history of violence against women, was seen wearing bloody clothing on the night of the murder, and admitted to cleaning up the crime scene. Jaime even concluded his closing argument by saying, "There is no verdict that says innocent. There is no verdict that says, jeez, you should go after Ted." We discern no court-imposed limitation on Jaime's ability to argue Ted's culpability in connection with this murder.

[¶43] Throughout the process, the burden remained on the State to prove beyond a reasonable doubt that George Jaime killed Starlette Vining. The jury, having heard all of the evidence regarding Ted's involvement, determined that Jaime was guilty of the crime. No injustice has been demonstrated on this record.

The entry is:

> Judgment affirmed.

---

**On the briefs:**

Hunter J. Tzovarras, Esq., Bangor, for appellant George Jamie

Janet T. Mills, Attorney General, Lara M. Nomani, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Hunter J. Tzovarras, Esq., for appellant George Jamie

Lara M. Nomani, Asst. Atty. Gen., for appellee State of Maine

Aroostook County Superior Court (Caribou) docket number CR-2012-275