MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2019 ME 74
Docket:       And-18-311
Argued:       March 5, 2019
Decided:      May 21, 2019

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:     SAUFLEY, C.J., and MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Dissent:      ALEXANDER, J.

STATE OF MAINE

v.

ABDIAZIZ HUSSEIN

GORMAN, J.

[¶1]  Abdiaziz Hussein appeals from judgments of conviction for failure to sign a criminal summons (Class E), 17-A M.R.S. § 15-A(1) (2018), refusing to submit to arrest by physical force (Class D), 17-A M.R.S. § 751-B(1)(B) (2018), and assault (Class D), 17-A M.R.S. § 207(1)(A) (2018), entered by the court (Androscoggin County, *Lawrence, J.*) following a jury trial.  Hussein argues that the trial court abused its discretion by excluding from evidence a cellphone video that showed some of the events that occurred during his arrest.  We agree and, as a result, vacate the convictions and remand the case for a new trial.[1]

---

[1]  Because our holding renders Hussein's second argument moot, we do not reach the issue of whether his conviction violates principles of double jeopardy.

## I.  BACKGROUND

[¶2]  Viewed in the light most favorable to the jury's verdict, competent evidence in the record supports the following facts.  *See State v. Fahnley*, 2015 ME 82, ¶ 2, 119 A.3d 727.

[¶3]   On November 10, 2017, an officer with the Lewiston Police Department went to Hussein's apartment in Lewiston to serve him a criminal summons.  After the officer was in the apartment, he told Hussein that he was issuing him a criminal summons and that Hussein "ha[d] to sign the summons."   The officer emphasized, however, that the summons simply established a court date for Hussein and that signing it was not an admission of guilt.  After Hussein repeatedly refused to sign the summons, the officer said, "Okay, you don't want to sign the summons, you're under arrest."[2]

[¶4]  Hussein then attempted to "run," but the officer "grabbed ahold of" Hussein and twisted his arm into what the officer described as an "arm bar." Despite the arm bar, Hussein punched the officer in the face.  As the officer persisted in attempting to arrest Hussein, he tried to pin Hussein to the floor of the apartment, but Hussein kept "flailing and fighting violently."  At some point during these events, the officer noticed that Hussein's sister was filming

---

[2]  It is not clear why the officer did not simply mark "refused to sign" on the summons and leave a copy of it with Hussein.

the arrest on her cellphone. The officer called for backup as he attempted to subdue Hussein. Shortly thereafter, additional officers arrived and took Hussein into custody.

[¶5] The State charged Hussein with refusing to sign a criminal summons (Class E), 17-A M.R.S. § 15-A(1), refusing to submit to arrest by physical force (Class D), 17-A M.R.S. § 751-B(1)(B), and assault (Class D), 17-A M.R.S. § 207(1)(A); Hussein pleaded not guilty to all charges. During pretrial discovery, Hussein produced his sister's cellphone video of the arrest.[3]

[¶6] On July 19, 2018, two weeks after a jury had been selected, and one day before the trial was to start,[4] the State filed a motion in limine requesting that it be permitted to "inspect the entire recording." The State requested that, absent a showing by Hussein that the video captured the entire incident, the video "be excluded from the trial" because it would be "misleading for the jury to see a video capturing only the incident after the warnings were given to the defendant regarding his failure to sign the criminal summons, after the defendant attempted to flee the room, and after

---

[3] Although the arresting officer was aware of the video, the police did not seize the phone as evidence nor did the State request a copy of the video before Hussein produced it.

[4] Another jury had been selected in May, but that trial was cancelled at the request of the State. The record does not indicate when the prosecutor became aware of the existence of the video. As indicated above, the arresting officer was aware that Hussein's sister filmed some or all of the events, but he did not view the video until July 18, 2018.

4

the assault of [the arresting officer]." The court viewed the video with counsel for the State and Hussein and subsequently denied the State's motion—all on the same day it was filed.

[¶7] On the next day, July 20, 2018, the court held a one-day jury trial. The State's case relied exclusively on the testimony of the arresting officer and one of the other officers who had responded to the arresting officer's request for assistance. At trial, the arresting officer testified that he had seen Hussein's sister record a portion of the arrest on her cellphone. Hussein's counsel then attempted to authenticate the video through the officer. Although the officer acknowledged that the recording fairly and accurately represented a portion of his interaction with Hussein, the court excluded the video, reasoning, "With respect to the attempt to authenticate this particular piece of evidence through [the officer], given his testimony as to his belief that it is not complete, [the] [c]ourt will sustain the State's objection."[5] Hussein asked the court to reconsider its ruling, but the court again sustained the State's objection.

---

[5] Because the trial court viewed the video as an offer of proof, it should have been made part of the record on appeal. No copy of the video played at trial was in the trial court's file, however. Hussein obtained another copy of the video and filed a motion to supplement the trial court record on appeal with a CD containing the video. The State did not object and we granted Hussein's motion; the video is therefore properly part of the record on appeal.

[¶8]   Hussein's counsel then told the court that he wanted to use the video to impeach the arresting officer's testimony.  The court sent the jury out of the courtroom and had the arresting officer review the video again.  The officer again testified that the video fairly and accurately represented what happened during the period of time captured on the video.  Hussein's attorney asked the arresting officer a series of questions about the video, and then indicated that he was ready to have the jury brought back.  When the jury returned, Hussein's counsel continued in his cross-examination of the arresting officer, and, although the jury had not seen the video, what the video showed was discussed in great detail in front of the jury:

> Q: Corporal . . . , in the full two minutes leading up to the moment that the other officers secure Mr. Abdiaziz—excuse me, Mr. Hussein in handcuffs, he did not—he, in fact, did not punch at you, right?
>
> A: He could not.
>
> Q: But the specific answer to the question is he did not punch at you, correct?
>
> A: Yes.  He could not.
>
> Q: And he, at most, had his right leg or his right knee drawn up, correct?
>
> A: Yes, he had his right leg, yup, shoved into my side.
>
> Q: And, in fact, he did not kick you, did he?

A: He's trying to push me off with his leg, yeah. Be more specific with me 'cause you're not letting—you're asking me did he kick me. I—once I had him pinned and I got my body weight on him, he's got his leg up into my ribs, and I'm keeping my body weight on there so he doesn't drive me because he's trying to fight free. He's not—he's not complying. He's still fighting.

If you looked at what your question is . . . I can't honestly answer your question with a yes or no because he was still fighting on the floor. He's got his leg up. It's in my ribs and I've got him pinned with my body weight. If I was up, yeah, he probably could have kneed me with his knees.

Q: But he didn't?

A: He couldn't because I had my body weight on him. Yes. Yes, he did not knee me is what you're asking because I did not allow him to do that.

Q: So he didn't strike you with his knee, and he didn't kick you with his feet, did he?

A: In the last portion of the video, no, sir.

Q: The two minutes up to the time that the other officers secured him, correct?

A: Yes.

Q: Beyond that, he has a pen in his left hand that whole two minutes, right?

A: No. I think that come from the trash can and th[e]n went flying over. I just see the video the other day. I just viewed this and he has a pen in his hand laying on the floor. Where it came from I don't know.

Q: But a moment ago I asked you he has a pen in his hand this whole time, right, and you said yes?

A: Well, you're saying the whole time.  What is the whole time?

Q: The two minutes.

A: For this video, yes.

Q: He has a pen in his hand?

A: Well, I—I want to disagree with you because what I see on the video is once I've got him pinned on the floor—and we can see a portion of the video, not the whole two minutes—then you see a pen in his hand because there was trash on the floor.

Q: Are you now changing your testimony from a moment ago where you said he did have a pen in his hand?

A: No, I'm not.  I'm answering your question.  You asked, Did he have a pen in his hand for the whole two minutes?  I don't know.  I can't answer that.  I only see the last portion of this.

. . . .

Q: Is it true that in the two minutes leading up to the time the other officers secure Mr. Hussein he has a pen in his left hand?

A: He has a pen in his hand at the very end of your video, yes, sir.

Q: And a few moments ago I asked you to confirm that he has a pen in his hand, right?  I asked you that question?

A: If I understood your question right, you stated it for the entire video, for the two-minute video he had a pen in his hand; and I answered no to that because alls I see a pen in his hand is at the very last.  I don't know how much time he has a pen in his hand.  That's the last part of it.  The very first part of it when I was

fighting with him he did not have a pen in his hand, so I don't know how to answer you.

Q: Did you see him pick a pen up from the trash?

A: I really can't tell you that. I know the trash can went flying over and debris spewed all over the floor because it was—it was in front of us. It may have been an opportunity for him to pick up a pen, but he did not have a pen when I first grabbed ahold of him. He did not have a pen in his hand until we went to the floor.

. . . .

Q: In the final two minutes leading up to the moment when the other officers put handcuffs on Abdiaziz, he has his left hand like this, right?

A: His left hand and he's on his shoulder. As we're trying to get him on the ground, he is laying on his left shoulder with this arm pinned down with a pen in his hand and I have his other arm like this and I have my body weight on him. That's the last part of the video that I see that he has a pen and it was probably—may have been my pen dropped in the altercation. I don't know that. But he's pinned on the ground like this, and he's got a pen in his left hand, yes. He's laying on the ground and I've got him pinned and I see the video, he actually had control of a writing utensil, whether it was a pencil or a pen.

Q: And, specifically, he's got it with his thumb holding it, right, like this? You can see—you saw the pen in his hand?

A: When we watched this video, I'm not paying much attention to where—how he holds the pen. I just know he has an object in his hand and it looks like a pen and it looks like one of my gray big pens that I sign summonses with.

Q: His left hand is open facing you, right, in that two minutes we're talking about?

A: Is it open? He's in possession of the last part of it with a pen. That's what you've been asking me.

Q: But the question is—

A: In the beginning he had nothing in his hand. When he was pinned up against the wall in a sitting position, he would not comply. He had nothing in his hand. He had his hand out trying to brace against the wall as I've got his right arm locked in an arm bar hold and he's trying to use that as leverage and I had to continue to put pressure on him to get him down to a partial subline (sic) position where he's laying and his arm is out, yes.

Q: The question I'm asking you is can you confirm that in that two minutes his left hand is open facing you?

A: I'd have to review it again. I just know that I watched the video and we're fighting into the wall and it's not clear until the camera gets to a certain position and then you see his hand with a pen in it. I don't—I don't recall seeing his hand with a pen in it the whole time because I never gave him a pen.

Q: Are you denying that his hand was open like this facing you in that final two minutes?

A: Sometime in the last two minutes, yes, his hand was probably open, yes.

Q: And it's not only open but drawn in like this, right?

A: He's laying on his side so I—I would say so. I don't know how he's got it extended. I'm on top of him so. And I only see his hand out there.

Q: And multiple times he said, I'll sign the summons, right?

[Prosecutor]: Objection.

. . . .

THE COURT: Objection's sustained.

. . . .

Q: [Arresting Officer], you had Abdiaziz—in that two minutes we're talking about you had Abdiaziz in an arm bar the entire time?

A: Yes.

Q: And you were in the kitchen, correct?

A: Yes, sir.

[¶9]  At the conclusion of the trial, the jury found Hussein guilty of all three counts.  On July 30, 2018, the court entered a judgment on the verdict, sentencing Hussein to ten days in jail and a fine of $500.00 for assault, seven days in jail—to run concurrently with the ten days—for refusing to submit to arrest, and twenty hours of public service for refusing to sign the criminal summons.  Hussein timely appeals.  *See* 15 M.R.S. § 2115 (2018); M.R. App. P. 2B(b)(1).

## II.  DISCUSSION

[¶10]  Hussein argues that the trial court abused its discretion by excluding the cellphone video from evidence.  We review a trial court's rulings on the admissibility of evidence for an abuse of discretion.  *State v. Maine*, 2017 ME 25, ¶ 23, 155 A.3d 871.  "A court abuses its discretion in ruling on

evidentiary issues if the ruling arises from a failure to apply principles of law applicable to a situation resulting in prejudice." *Id.* (quotation marks omitted); *accord Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."), *superseded on other grounds by statute*, Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub. L. 108-21, 117 Stat. 650; *Saka v. Holder*, 741 F.3d 244, 250 (1st Cir. 2013) ("Under [the abuse of discretion] standard, we uphold decisions unless they are made without a rational explanation, inexplicably depart from established policies, or rest on an impermissible basis. Any error of law is, inherently, an abuse of discretion." (citations omitted) (quotation marks omitted)).

A.    Authentication

[¶11]    Maine Rule of Evidence 901(a) articulates the standard for authentication of a proffered exhibit: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." M.R. Evid. 901(a). One method of satisfying the authentication requirement is to present a witness who testifies that the "item is what it is claimed to be." M.R. Evid. 901(b)(1). We have held that "Maine Rule of Evidence 901 embodies a flexible approach to authentication reflecting a low

burden of proof." *State v. Dube*, 2016 ME 50, ¶ 11, 136 A.3d 93 (quotation marks omitted); *see also* 2 Kenneth S. Broun et al., *McCormick on Evidence* § 212, at 6 (7th ed. 2013) ("There is no single formula [for authenticating evidence] that must be satisfied in every case . . . .").

[¶12]  In this case, the officer twice testified that the video "fairly and accurately" represented the events that occurred during the time span of the video.  Contrary to the State's argument, neither Rule 901 nor our case law requires that the person taking the video be the one to authenticate it.  *Cf. State v. Sargent*, 361 A.2d 248, 251 (Me. 1976) ("The foundation for admission of a photograph into evidence may properly be laid by *any* witness who knows that it fairly represents what it purports to represent." (emphasis added)); Field & Murray, *Maine Evidence* § 403.2.1 at 117 (6th ed. 2007) ("[T]he foundation necessary to introduce a photograph can be established simply. The proponent merely asks a witness who has familiarity with the object or scene depicted at the relevant time whether in fact the identified and proffered photograph fairly and accurately depicts the . . . scene . . . in question at the relevant time." (quotation marks omitted)).

[¶13]  Because the arresting officer clearly had familiarity with what is shown in the video, and because he testified that the video "fairly and

accurately" represented the events shown in the scene, the officer could—and did—properly authenticate the video. *See* M.R. Evid. 901(b)(1).

B.     Admissibility

[¶14]  Even if an exhibit is properly authenticated, however, a court may exclude the evidence if its probative value is substantially outweighed by a danger of unfair prejudice or misleading the jury.  M.R. Evid. 403; *see, e.g.*, *State v. Michaud*, 2017 ME 170, ¶ 8, 168 A.3d 802.  "For purposes of Rule 403, prejudice means an undue tendency to move the fact finders to decide the issue on an improper basis."  *Michaud*, 2017 ME 170, ¶ 8, 168 A.3d 802 (quotation marks omitted).

[¶15]  In this case, the State repeatedly argued that, even if the video accurately depicted a portion of the interaction between the arresting officer and Hussein, it should not be admitted because it was not a "complete" record of the arrest.  If, by focusing on the "incompleteness"[6] of the video, the State was intending to argue that it was unfairly prejudicial, its argument is not persuasive.

---

[6] The rule of completeness, as set out in Maine Rule of Evidence 106, logically applies only after one party has actually "utilized" a part of a writing or recording: if one party introduces only a segment of evidence, the opposing party may seek to introduce the remaining portion in order to place the previously admitted portion into context. *See, e.g., State v. Archer*, 2011 ME 80, ¶ 27, 25 A.3d 103.  Rule 106 was not designed as a tool to preclude the admission of evidence; rather, the rule creates a remedy for those times when "fairness demands" that an additional portion of a "writing or recorded statement" be admitted. *Id.* (quotation marks omitted).

[¶16]  We acknowledge that, in some cases, the completeness of a video may well be a concern because, with respect to video evidence, "[t]here is no question that the probative value of videotaped evidentiary presentations is very high," but "[t]he potential for unfair prejudice from video evidence is also high."  Field & Murray, *Maine Evidence* § 403.2.3 at 122 (6th ed. 2007).  Here, however, because the court did not mention *any* prejudicial effect of the video, let alone any *unfair* prejudicial effect, we must conclude that the court's denial of the defendant's request was not based on any 403 considerations.  *See State v. Poland*, 426 A.2d 896, 900 (Me. 1981) (stating that a trial court should "articulate[] on the record at least some of the factors bearing upon [its] exercise of Rule 403 discretion").

[¶17]  Because the trial court did not rely on Rule 403 when excluding the video, and because Hussein properly authenticated the video, the court's refusal to admit the video so that the jury could view it was an abuse of discretion.  *See Koon*, 518 U.S. at 100; *Saka*, 741 F.3d at 250; *Maine*, 2017 ME 25, ¶ 23, 155 A.3d 871. We note that a determination that a trial judge has "abused his discretion" does not equate to a finding of bad faith, intentional wrongdoing, or misconduct by the judge.  Trial judges are called upon to make multiple, swift decisions—in "real" time—during the course of trials and

hearings.  Abuses of discretion occur when, in making one of those rulings, the judge makes an error in the application of the law to the facts:

> Preliminarily, it may be said that judicial discretion means *legal* discretion in the exercise of which the court must take account of the law applicable to the particular circumstances of the case and be governed accordingly.  Implicit is conscientious judgment directed by law and reason and looking to a just result.  Consequently, if the trial judge misconceives the applicable law or misapplies it to the factual complex, in total effect the exercise of legal discretion lacks a foundation and becomes an arbitrary act.  When this occurs it is the duty of the reviewing court to adjudicate the controversy in the light of the applicable law in order that a manifest denial of justice be avoided.

*Wasserstein v. Swern & Co.*, 200 A.2d 783, 786 (N.J. Super. Ct. App. Div. 1964) (citations omitted).  That is what occurred here when the court concluded that the recording had not been properly authenticated.

C.      Harmless Error

[¶18]  The State asserts that, even if the trial court did err by excluding the video, any error was harmless, a position echoed by the dissent.[7]  Because the State's case rested, in large part, on the credibility of the arresting officer, and because the video could be viewed as undermining some portions of that officer's testimony, we disagree.

---

[7]  The dissent also suggests that the video is "repetitive" of the testimonial evidence.  There was no claim by the State that the two-minute video would cause undue delay, waste time, or "needlessly present[] cumulative evidence."  M.R. Evid. 403.

[¶19] Rule 52 of the Maine Rules of Unified Criminal Procedure provides, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights shall be disregarded." M.R.U. Crim. P. 52(a). "An error is harmless when it is highly probable that it did not affect the jury's verdict. In contrast, harmful error is error that affects the criminal defendant's substantial rights, meaning that the error was sufficiently prejudicial to have affected the outcome of the proceeding." *State v. Jaime*, 2015 ME 22, ¶ 38, 111 A.3d 1050 (alteration omitted) (citations omitted) (quotation marks omitted); *accord State v. Elwell*, 2002 ME 60, ¶ 14, 793 A.2d 499.

[¶20] Here, the arresting officer testified that Hussein (1) refused to sign the summons; (2) had run from him; (3) had punched him in the face; and (4) was "flailing and fighting violently" as the officer attempted to arrest him—all facts that support Hussein's conviction.

[¶21] In contrast, Hussein correctly argues that the video shows him pinned to the ground by the officer, with a pen in hand, repeatedly saying that he will sign the summons—not fighting and flailing—and that the video contains no evidence that he ever assaulted the officer. At trial, Hussein was permitted to ask the arresting officer, who had seen the video at least three times, about what the video showed—parts of this testimony we quote above. Hussein asserts that the video contradicts portions of the officer's testimony,

and that the jurors should have been permitted to view the video in order to assess the officer's credibility. We agree.

[¶22] Here, "where the verdict of guilty depended upon the jury's finding [the officer] credible, the exclusion of admissible evidence that had a tendency to undermine [his] credibility is prejudicial." *Elwell*, 2002 ME 60, ¶ 14, 793 A.2d 499. As such, the trial court's exclusion of the video was sufficiently prejudicial to have affected the outcome of the proceeding—the error was not harmless. *See id.*; *Jaime*, 2015 ME 22, ¶ 38, 111 A.3d 1050.

The entry is:
> Judgment vacated. Remanded to the trial court
> for a new trial.

---

ALEXANDER, J., dissenting.

[¶23] I respectfully dissent.

[¶24] Abdiaziz Hussein was charged and ultimately pleaded guilty, as part of this proceeding, to theft of a stun gun in Lewiston on or about November 9, 2017. *See* 17-A M.R.S. § 353(1)(A) (2018).

[¶25] In an appropriate exercise of discretion, the Lewiston police elected to summons rather than arrest Hussein for that offense. Accordingly, on November 10, 2017, a Lewiston police officer went to Hussein's residence to attempt to serve the summons. At the residence, the officer advised

Hussein that he was issuing a criminal summons and that Hussein had to sign the summons. The officer emphasized that the summons, and signing the summons, simply established a court date and that signing the summons was not an admission of guilt. Despite this advice, Hussein repeatedly refused to sign the summons.

[¶26] Because he refused to sign the summons, the officer indicated that he had to arrest Hussein. Hussein then attempted to flee, but the officer grabbed Hussein's arm, at which point Hussein punched the officer in the face. In punching the officer in the face, Hussein committed the Class C felony of assault on an officer.[8] 17-A M.R.S. § 752-A (2018).

[¶27] Hussein and the officer then continued to struggle, causing them both to end up on the floor of the apartment, with the officer on top of Hussein. At some point after the charged crimes had been committed, and after Hussein and the officer were on the floor, another occupant of the apartment began video recording the struggle, using a cellphone.

[¶28] Sometime prior to trial, the State learned of the existence of the cellphone video recording, sought to inspect it, and moved that the video be excluded from the trial. At several points before and during the trial, the

---

[8] The record does not indicate why the State elected to charge Hussein with simple assault (Class D), 17-A M.R.S. § 207(1)(A) (2018), rather than the more serious felony that the record indicates Hussein actually committed.

parties debated whether the video should be allowed to be offered into evidence.

[¶29]  The record to support Hussein's offer of the video into evidence included the testimony of the arresting officer and another officer as to the events at the apartment, the video itself, and representations—but no testimony or affidavits—by Hussein's counsel as part of an offer of proof, M.R. Evid. 103(a)(2), (b), seeking to admit the video.

[¶30]  Although the trial court ultimately decided that the video should not be admitted, it permitted extensive examination of the officer regarding the events that appeared on the video, with that examination quoted in the Court's opinion.  Court's Opinion ¶ 8.  That examination, consistent with the video itself, indicates that Hussein and the officer were struggling on the floor for approximately two minutes while the recording was going on and that, during that time, Hussein, at some point, possessed a pen.  Hussein's counsel argued that Hussein's possession of the pen and statements heard on the video demonstrated that Hussein, after initially refusing to sign the summons and being subject to arrest, was indicating a willingness to sign the summons.

[¶31]  The Court holds, surprisingly, that because the officer's testimony purportedly "fairly and accurately represented the events" shown on the video and properly authenticated the video, M.R. Evid. 901(b)(1), the trial

court's refusal to admit the video was "an abuse of discretion." Court's Opinion ¶¶ 13, 17.

[¶32]  In my view, the trial court did not err in refusing to admit the video. And even if, as the Court concludes, the trial court abused its discretion in refusing to admit the video because it deemed the video not properly authenticated, that error was harmless. *See* M.R.U. Crim. P. 52(a).

[¶33]  The Court's opinion itself describes the officer's testimony regarding the events that occurred and are depicted on the video and notes that the officer testified that the video "fairly and accurately represented the events shown in the scene." Court's Opinion ¶ 13.  If the officer's testimony represented that the video fairly and accurately described the events shown regarding the struggle that occurred in attempting to arrest Hussein after the crimes had been committed, then the video could properly have been excluded as repetitive of testimony already given.

[¶34]  Further, and more importantly, there is no dispute that the video recording began only after Hussein had refused to sign the summons, attempted to flee, punched the officer in the face, and refused to submit to arrest—the crimes with which he was charged and convicted by the jury. The only relevance of the video was to show the continuing struggle to arrest Hussein after he had refused to submit to arrest, to indicate minor

discrepancies between the after-the-crimes events as depicted on the video and the officer's testimony about those events, and to provide support for Hussein's claim that, with a pen, he was attempting to indicate to the officer that he was then willing to sign the summons. Hussein's prior attempt at flight, refusal to sign the summons, and punching the officer in the face had ended any chance that Hussein would not be arrested well before the video of the struggle with the officer had begun and Hussein had made his belated offer to sign the summons.

[¶35] Because the video did not demonstrate major discrepancies in the officer's descriptions of the crimes committed, and was irrelevant to the crimes with which Hussein was charged—being a recording only of events after the crimes had been committed—the trial court properly excluded the video.

[¶36] Although the trial court indicated that its reason for excluding the video was lack of proper authentication, M.R. Evid. 901(b)(1), all relevant factors must be considered in determining whether—or not—the court abused its discretion in excluding the video. The abuse of discretion determined by the Court may be found only when the appellant demonstrates that the trial court, in discretionary decision-making: (1) considered a factor prohibited by law; (2) declined to consider a legally proper factor under a

mistaken belief that the factor cannot be considered; (3) acted or declined to act based on a mistaken view of the law; or (4) expressly or implicitly found facts not supported by the record according to the clear error standard of review. *Smith v. Rideout*, 2010 ME 69, ¶ 13, 1 A.3d 441; *Pettinelli v. Yost,* 2007 ME 121, ¶ 11, 930 A.2d 1074; *see also Sager v. Town of Bowdoinham,* 2004 ME 40, ¶ 11, 845 A.2d 567 (abuse of discretion may be found only when an appellant demonstrates that the decision-maker "exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law").

[¶37]  Considering that the video was repetitive of evidence presented to the jury, did not demonstrate significant discrepancies in the officer's description of the criminal acts, and began after the crimes had been committed, there is no basis for the Court to conclude that the trial court abused its discretion, requiring that the convictions for these charges be vacated.

[¶38]  Seeking to vacate the assault conviction, Hussein also argues that convictions for both assault and refusing to submit to arrest result in two convictions for the same criminal act, violating his constitutional protection from double jeopardy.  *See Ayotte v. State*, 2015 ME 158, ¶¶ 12-14,

129 A.3d 285. Double jeopardy concerns are avoided if each statute at issue requires proof of a fact that the other does not. *Id*. ¶ 14.

[¶39] Assault requires intentionally, knowingly, or recklessly causing bodily injury or offensive physical contact. 17-A M.R.S. § 207(1)(A) (2018). Refusing to submit to arrest requires an intent to hinder, delay, or prevent a law enforcement officer from effecting an arrest with use of physical force against the law enforcement officer. 17-A M.R.S. § 751-B(1)(B) (2018). Refusing to submit to arrest requires proof that the crime was committed against a law enforcement officer, an element of proof not required for an assault. Assault requires proof that the perpetrator inflicted bodily injury or offensive physical contact on the victim, an element of proof not required for refusing to submit to arrest, where the physical force used may, as initially occurred here, involve pulling away and attempting to flee from a law enforcement officer without causing injury or offensive contact. It should also be noted that the physical contacts related to Hussein's refusal to submit to arrest continued for minutes after his specific assault on the officer, constituting a separate criminal act. Thus, no double jeopardy is generated by the convictions.

[¶40] I would affirm the trial court's judgment entered on the jury's verdict.

---

Rory A. McNamara, Esq. (orally), Drake Law, LLC, Berwick, for appellant Abdiaziz Hussein

Andrew S. Robinson, District Attorney, Michael B. Dumas, Asst. Dist. Atty., and Lisa R. Bogue, Asst. Dist. Atty. (orally), Prosecutorial District III, Lewiston, for appellee State of Maine

Androscoggin County Unified Criminal Docket docket number CR-2017-3619
FOR CLERK REFERENCE ONLY